## REA JACKSON v̇. THE STATE.

### No. 3566.  Decided October 3, 1906.

**1.—Burglary—Confession—Torture—Want of Corroboration—Insufficiency of Evidence.**

Where upon trial for burglary, the conviction of defendant was based upon his confessions and those of his codefendants, and it was shown that these confessions were extorted from defendant and his codefendants, and were not voluntarily made, and were not corroborated, the verdict of guilty could not be permitted to stand.

**2.—Same—Contemporaneous Offenses—Involuntary Confessions.**

Upon a trial for burglary, testimony of other burglaries than the one for which the defendant was on trial, although committed contemporaneously with the burglary on trial, was not admissible where such testimony consisted of confessions made under acts of extortion and cruelty.

**3.—Same—Confessions Made After Acts of Extortion—Cruelty.**

Where upon trial for burglary, the confessions of defendant introduced in evidence were made after he was threatened with hanging, and were involuntarily made, the same were inadmissible in evidence, unless it was shown that the defendant's mind was relieved of the effect produced by these acts of cruelty; none of the stolen property having been found.

Appeal from the District Court of Shelby.  Tried below before the Hon. James I. Perkins.

Appeal from a conviction of burglary; penalty, three years imprisonment in the penitentiary.

Besides the facts stated in the opinion by Judge Brooks, the facts constituting the acts of cruelty in extorting the confession from defendant and his codefendants are fully set out in the concurring opinion of Presiding Judge Davidson.

*B. M. Short & Sons,* for appellant.

*J. E. Yantis,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of burglary, and his punishment fixed at confinement in the penitentiary for a term of three years.

In the view we take of this case, it is only necessary to pass upon the sufficiency of the evidence.  The facts, in substance, show that defendant and three or four other negroes were arrested charged with burglarizing several stores in Center, Shelby County.  After they were arrested the sheriff of Shelby County and the constable of precinct number 1, took defendant and his companions out of the jail, about dusk, put ropes around their necks, and pulled them up by such ropes, demanding that they should confess to the burglaries charged against them, stating at the time, that they would hang defendant and his companions, if they did not disclose where the goods were that had been taken from the premises.  One of the defendants was

taken from the jail, a handkerchief tied over his face, his pants pulled down, so as to expose his body, and he was whipped. One witness states he was hit a few licks; and that this codefendant was put in some brush, the brush set on fire, near where he was lying. Many other fiendish acts of barbarity and cruelty were indulged in by these officers to extort confessions from the defendant and his codefendants. We know of no rule of law permitting confessions obtained under such circumstances to be introduced in evidence. The State makes an effort to contradict this evidence detailed, but there is no serious contradiction of it in the record. On cross-examination of the sheriff and constable they each confess the above stated acts of barbarity. Confessions of codefendants, obtained as above detailed, and testimony of other burglaries than the one for which appellant was on trial, although committed contemporaneously with the commission of the burglary on trial, would not be admissible under the circumstances of this case. McAnally v. State, 73 S. W. Rep., 404; 7 Texas Ct. Rep., 327. After a careful inspection of this record there is not a particle of corroboration of the confessions so extorted. Upon no theory of the law can the verdict be permitted to stand. The cruelty manifested on the part of the officers toward defendant has not been surpassed since the days of the Spanish Inquisition. Any officer engaging in or permitting such barbarity, should be impeached. The evidence wholly failing to support the conviction, the judgment is reversed and the cause remanded. The reporter will report the facts.

*Reversed and remanded.*

DAVIDSON, PRESIDING JUDGE.—I desire to concur in the opinion rendered, for the reasons hereinafter stated.

During the trial the State, through Stewart Smith (deputy sheriff), Tatum Davis (a citizen) and Zack Booth (sheriff) introduced the confession of appellant. These confessions were supposed to have occurred shortly after defendant and other little negroes had been punished as shown herein. The confessions introduced were made, as these witnesses state, after they had had the negroes up in the courthouse,—such is the recollection of the witnesses. The substance of the testimony is that the negroes were arrested, without process of any sort, carried to the sheriff's office and questioned about some burglaries. They denied all knowledge, and were put in jail, and kept there for a length of time, rather indefinite, a day or two, or may be two or three days. They were then brought to the courthouse, one night about dark. There were present, besides the negroes, witness Stewart Smith, Pleas Smith (the jailer), Zack Booth, the sheriff, and Tatum Davis. Stewart Smith testified as to what occurred at this point, as follows: "We had them up here, and had a rope around their necks; and what we could pull up with our hands we done it." The rope used was "about the size of your finger,

I reckon. I do not know but it seems like it was." This was in answer to the question, "Was it a cow lariat?" "Q. If you were just going to pull them up with your hands, what did you have to come up in the courthouse for? A. We didn't want everybody catching on to us, if we got anything we didn't want everybody to know it. Q. What was the negro's name you hung first? A. I would not say which one; we never hung any more than we could pull up with our hands and I don't deny that. Q. How many negroes did you have up here at the time you hung the first one? A. I told you we had two or three and I don't remember which ones. Q. You hung them all right? A. What we could pull up with our hands we did, and would do it again. Q. Didn't you know that was a violation of the law? A. To hang them: but not what we did. Q. Didn't you know it was a violation of the law: A. No, not when we were trying to uphold the law. Q. Who told you to assist in hanging those negroes that night? A. I don't know whether anybody told me. Q. You went into it of your own free will? A. Yes sir. Q. Did you string up any white boys? A. No, sir; we had not caught any white boys. Q. You testified in another case, that you would string them up if necessary? A. I said, if it had been necessary. Q. Regardless of his color? A. Yes sir. Q. Under the same circumstances? A. Yes, sir; I said it."

Tatum Davis, on cross-examination, testified: "Q. What part of the courthouse did they have them in? A. Just a few steps from here—under the judge's stand. Q. Didn't they tell you all about it that night; didn't these boys confess to going in these places that night? A. No sir. Q. What did this boy say? A. He would not say much of anything. Q. What, if anything, did he say? A. I would hear Stewart Smith or Zack Booth, one, say, 'Where are those things?' and they would say, 'I don't know.' Q. And they would give a fresh pull, and ask another question? A. No, they said, if they didn't tell they were going to hang them, but they didn't believe they were going to hang them, they found out that it was just a sham when they got up there. Q. How do you volunteer that statement?. A. By their actions."

Zack Booth, sheriff testified, after stating preliminary matters: "Q. How many of them did you put ropes around their necks? A. I don't remember. We might have put a rope around one or two, and might have put it around all. That was all that was done. No violence was done any of them. Q. Didn't you pull on the rope or threaten to hang them. A. No, sir. Q. Didn't you pull on the rope at all. A. No, sir. Q. Didn't raise them up. A. No, not by the rope. Q. What did you raise them up by? A. If they were raised at all it was just a little scare, and that was all there was to it. No violence done any of them. Q. You say that no violence was done this boy? A. No. Q. No threats; no threats of any violence? A. No, I didn't say that, there were threats. Q. What were they?

A. I don't remember exactly; that I would hang them or something of that kind. Q. Who was up there at the time those threats were made? A. The best of my recollection there was Tatum Davis, Stewart Smith and there might have been somebody else; I don't remember whether there was or not. Q. And no violence was done to any of those boys at all? No, the only violence that amounted to anything was the negro that has been tried, and it didn't amount to anything. Q. You took him in the woods? A. Yes, sir. Q. You took down his pants after having his feet tied? A. That was not to get anything out of him in regard to what he had done. Q. But you done that? A. Yes, sir. Q. Threw him in a brush pile and threatened to burn him up? A. Yes, sir. Q. You brought all of these negro boys up here but one that night? A. I didn't bring them up; I was up here and the other boys brought them all up but one. Q. And this boy is the one that you didn't bring? A. Yes, sir. Q. You know him well; couldn't be mistaken about it? A. No, I am not mistaken."

Tatum Davis testified on cross-examination: "Q. You are the same witness that testified that you went out with Thomason and Mr. Booth, and took Roy Brown and tied him, hand and foot, and took his pants down, and whipped him, and then threw him in some brush and threatened to burn him: you are the same witness that testified to that? A. Not just exactly that way, I am not. Q. Not exactly that way, but you was there when that was done? A. Not exactly that way I said. Q. What is the difference? A. He was not tied hand and foot and whipped. Q. How was he tied? A. He had a handkerchief tied over his face. Q. What else was done? A. He was threatened to be whipped and was hit a few licks. Q. Where was his pants? A. They were on his legs, his pants were pulled down. Q. How was he tied? A. He was tied around the head with a handkerchief. Q. Any other way? A. No, that is all. Q. Was he not tied hand and foot? A. No, sir. Q. His hands were not tied behind him? A. No, sir. Q. Are you sure of that? A. If, they were, it was more than I noticed. Q. His feet were not tied together? A. No, sir. Q. Bob Thomason was there? A. Yes. Q. Didn't he tie that boy's feet with a grass rope or grass string? A. All the tying I saw on him was the handkerchief around his head. Q. Were you there when they threw him in the brush and threatened to burn him? A. I was there when they put him under the brush and tried to make him talk. Q. Didn't you set the brush afire close to him when he was blindfolded? A. I don't say that I did, but it was done. Q. Who did it? A. Thomason and Booth. Q. You there all the time? A. Yes sir."

Appellant testified in regard to this transaction, as follows: "Q. Just tell the jury what occurred, and how you happened to tell that? A. Mr. Pleas Smith and Mr. Tatum Davis came up in the jail; got me one night just about dark, and told me to come on. I had done

laid down, and I got up and started to put on my shoes. He told me not to put them on, that I could.get them in the morning. We come on up in the courthouse, and under the judge's stand somewhere. Mr. Booth put a rope around my neck, and told me I could tell about those things, and they pulled me up, and I told them. And I told them I didn't know, and they pulled me up again. I told them that I went in there. And they asked me what did I get? I couldn't tell them because I didn't know. He said, there was some meat and stuff taken out, and asked me, didn't we get it. I told him yes. I didn't know what was taken out, and they told me what was taken out. Mr. Tatum Davis come there, and said, 'I like you boys, and hate to do you that way, but Mr. Booth told me to do it, and if I don't do it he will put me in jail.' And said he was going to take me out every evening and initiate me until I told where those things were. After he left out of. jail, I saw him and Mr. Bob Thomas and Mr. Booth went off with Roy Brown and when he came back he said they whipped him. Mr. Tatum Davis, when he started out he said, 'when I dress all you real nice like I did Roy, all of you will know where those things are.'

Q. Who said that? A. ·Mr. Tatum Davis.

Q. You hear Mr. Tatum Davis testify here while ago, that you told him up there in jail, after Mr. Webb told· you if you told anything it could be used against you in court, what about that? A. He didn't say nothing about that; he didn't say nothing about what could be used in court.

Q. What did you tell Mr. Davis? A. He was here the night they asked me about going in the stores. Q. And you told him you did go in the stores? A. Yes, sir. Q. And did you tell him in· the jail also? A. Yes sir; that was after that. Q. What made you tell them that? A. They were fixing to kill me; they said they were going to hang me, and I didn't want to die. Q. Who else did they have up here that night they hung you? A. They got Ab first, and they had him; and then got me. And then went back and got Ed Hall, and then brought him up. And then brought him and me back to the jail, after they got through choking him. I was in the courtroom and heard him breathing loud down there under the judge's stand; and then they turned him loose, and carried him and me back to the jail. Mr. Tatum Davis and Stewart Smith went somewhere that night; they carried Ab off in the woods somewhere, and they carried me and Ed back, and brought Roy out. Q. By himself? A. Yes, sir, and kept him and Ab up here, and then brought them back again. Q. How many times did they pull you up? A. Three times. Q. Where did they place the rope? A. Around my neck; they first had the knot behind my head, and they saw that was not hurting me, and then they turned it-in front, and they asked me if they would let me down, would I tell it. And they pulled on it again, and I told them if they would let me down I would tell them. They asked me, did I go in there; and I told them yes; and they asked me what I

got, and I told them that I didn't know, and they told me what was taken out. I tried to get them not to hang me. I told them that I didn't know anything, and I begged them not to do it, and they told me to hush crying and they let me down.

Q. What about that statement you heard Stewart Smith make about you having confessed to him in front of the jail door? A. I never did tell him anything about it; he came up there and made Ab tell him that we went in there. Q. How did he make him? A. He just opened the door and sat down in the window, and told Ab that he could tell him, and he said he didn't know what to tell; and he says you know what he told in the courthouse. He told him that Ed got a pistol, and I got a pair of pants, and he got some meat and a sack of flour, and some lard and a whole lot of stuff.

Q. You never then made any statement at all to Stewart Smith? A. No, I never told him that I went in there; he was here the night they had me here in the courthouse. Q. You told it here in his presence? A. Yes, sir. Q. This conversation with Ab Harper was after they had you up here and hung you? A. Yes, sir.

Q. When Mr. Stewart Smith came over to the meat market and told you he wanted you, what, if anything, did he tell you as you went on? A. He came and asked me my name, and I told him; and he asked if I was Rea Jackson, and I told him I was. He told me to come on with him, and I started. Between the courthouse fence and the market he asked me what we boys meant by going in these stores, and I told him I never went in them. He told me I was a God damn liar, and he asked me again. I told him I didn't go in them. He told me not to dispute his word. He brought me over to the courthouse, and told me to sit down, and I sat down in the sheriff's office a little while; and he got the keys and put me in jail. Tuesday night he brought me up in the courthouse.

Q. Who put the rope around your neck? A. Mr. Zack Booth.

Q. What did he tell you he was going to do with you? A. He said he was going to hang me; I couldn't see what he had the rope fastened to. Q. Did they have any lights here? A. Yes sir; but the light was not down there under the Judge's stand where they hung me. Mr. Pleas Smith was sitting there on a table holding a candle.

On cross-examination. Q. What day was it Mr. Tatum Davis told you he hated to do, but Mr. Booth told him to do? A. I don't know what day it was, but they had us cleaning out a well back of Mr. Emmett Henry's.

Q. What was he doing; was he hanging you then? A. No, he was bringing us back to jail.

Q. What was it he said? He said he hated to do us that way, but Mr. Booth told him to, and if he didn't do it Mr. Booth would put him in jail.

Q. Did he hang you? A. He helped. I don't know who put the rope around my neck and Mr. Booth told Stewart Smith to come on.

Q. Did they hang you until you stuck out your tongue? A. No sir, I didn't have to stick out my tongue.

Q. Did they hang you until you lost your breath? A. Mighty near it, I had to blow for it mighty hard.

Q. Did they cut a gash around your neck? A. No, it was a slick rope." At this point appellant described the hurting of his neck, etc., caused by the hanging.

It may be necessary here to also give some of the testimony of the witness Mose Walling, introduced by the defendant. He was questioned with reference to a pistol, which was identified as a pistol taken on the night of the alleged burglary, from one of the houses supposed to have been burglarized. Without going into questions and answers, this witness stated, that he got the pistol from Wes Allison. It was sufficiently described to be identified as the pistol taken from the store, and was a 38-Smith & Wesson, six inch barrel, pearl handle; that Stewart Smith got the pistol and brought it to town, and it was claimed by Emmett Henry. He testified that Allison told him subsequent to getting the pistol, that it was taken from the store of Mr. Jones. It is further shown that Wes Allison left the State and went to Louisiana, and that he was a white man, as was also Mose Walling. None of the stolen property was traced into the hands of defendant.

It would hardly be the subject of discussion that any testimony obtained from the defendant, by means of the tortures inflicted upon him, could be used as testimony, unless in pursuance of the confession stolen property was found. It is also equally well settled that if appellant should have made any subsequent confession, that the State must exclude the idea that he was laboring under fear or hope of reward, etc., by reason of the punishment inflicted by the officers. It was sought to introduce the confession that one or more of the witnesses testified was made by defendant in jail after the hanging. This is most emphatically denied by appellant. If there was a subsequent confession by appellant, to make it admissible, the State must show that the defendant's mind was relieved of the effect produced by the hanging of himself and the torture of hanging and threatened burning of any of the other boys. So, without going into a discussion of these matters further, we are of opinion that the bills of exception were well taken; and these confessions were not admissible under the facts shown by this record.

I concur with my Brother Brooks in stating that this case has not been sufficiently made out, and under circumstances that would justify this court in affirming the judgment of conviction. These were young negro boys, engaged in working about the town, and there can be no question, in my judgment, after a calm review of this record, that these boys did not participate in the burglaries. If the testimony of

Mose Walling (a white witness) is to be credited, then Wes Allison (a white man) was clearly connected with the burglaries of the stores, for he disposed of a pistol which was taken from one of the stores, to the witness Walling. Walling was arrested for carrying the pistol and convicted. In this connection it is shown beyond any question that Wes Allison had left the State immediately after these troubles, and went to the State of Louisiana. As we understand this record, the officers had not attempted to have him arrested and brought back to Texas for trial. I have thought it proper to detail some of the testimony in this connection as one of the reasons for my concurring opinion.