HERMAN SIGLER v. THE STATE.

No. 20915. Delivered April 24, 1940.

The opinion states the case.

*Ivan Irwin* and *Wallace B. Moore,* both of Dallas, and *B. F. Patterson,* of San Antonio, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

Appellant was convicted in the District Court of Bexar County on a burglary charge, and under an enhanced penalty clause alleging former convictions, he was given a term of ten years.

Appellant resided in Dallas County, Texas. Mike Nolte lived in San Antonio, Texas, and had a beer distributing business situated at 1309 East Houston Street. The building was burglarized on April 23, 1939. The witness testified that he did not know who did it; that it happened on Sunday, sometime between twelve o'clock noon and Monday morning. A safe containing $1,700.00 was cut open from the back and the money extracted. The tools used in doing so were left on the premises. They have never been identified and the appellant is not shown ever to have possessed them or to have had any connection with them. A finger-print expert was called and he failed to find any finger prints on the tools. The money taken was mostly in $1.00 bills. There was some silver. There were also checks in the amount of $911.00. There is no evidence to show that any of the money was in $5.00 or $10.00 bills. On the next day in Dallas, the appellant appeared at an automobile place with a

girl and purchased for her, in her own name, an automobile, making payment of $250.00 in $5.00 and $10.00 bills and larger ones. He testified that this money belonged to the young lady and that he was simply helping her to get the best bargain she could in a car and that she paid him $10.00 for his trouble. Appellant said that he was in Dallas County on that date and not in San Antonio, and denied any knowledge of the burglary. No one saw him in San Antonio, nor was he seen with anyone else connected with the burglary. Reliance is had for a conviction solely upon the written confession, signed by the appellant, which he repudiated upon the trial, claiming that he had been forced to sign it.

The facts with reference to the confession and the appellant's connection with it may be summarized as follows: One Carlos E. Breazeale testified that he lived in Dallas and was employed by a Distributing Company which handled the same brand of beer which Nolte handled in San Antonio; that he made a contract with Guy Nabors, said to be a man with a criminal record in Dallas, by which witness was to mark a place on the San Antonio warehouse where an entrance might be made and arrange for the robbery which Nabors was to perpetrate and give Breazeale twenty per cent of what he got for Breazeale's services. This was carried out and Nabors gave him $280.00. He gives no evidence of having any connection with the appellant whatsoever

The statement of appellant was taken by E. D. Schacklett, Clerk of the San Antonio Police Department. He used a printed form in making the statement, but the record does not disclose how much was printed and how much was written in. He was called by the police, in the manner hereinafter stated, about two o'clock one night for the purpose of taking this statement and did so while the officers involved were in and out of the room and about the premises. The exact date of the statement is not given by the witness and the same is not dated. The date of the statement may be ascertained by calculating the number of days from the date of the arrest hereinafter detailed, which we find to be on the 29th day of June. That seems to be verified by the statement of A. G. Lankford, a City Detective of San Antonio.

The appellant testified in his own behalf and stated that he was reared in Kaufman County, Texas, where his family now resides, but during the past several years he had lived in Dallas. He did not know where he was on Sunday, April 23rd, the date of the burglary, other than that he was in Dallas. He

was arrested on the 20th of June and brought to San Antonio. Upon arriving there, he was carried to the Ranger Department in a big white building. He says they took him upstairs for about an hour and a half and then to Alamo Heights and placed him in a little room with bars on it.

On the evening of the second night (presumably June 21st) they took him to Floresville. He was accompanied by three officers, Smith, Robinson and Lankford, and another fellow whose name he did not know. He testified further that they stayed with him all night in Floresville; that they took him over to the court house the next morning at ten o'clock and took him back to the sheriff's quarters; that they stood him up all night and all day, asking him questions. Some one would stay with him all the time while others slept. When he would sit down the officers would kick him and make him get up. He was made to stand up from about ten o'clock in the morning until that night, without any chance to sleep, and all that night and day and the next day until about eleven o'clock. He had nothing to eat and no place to sleep. They next took him to San Antonio and put him in the city jail, where he stayed the rest of the night and the next day, and the next night they came up and brought him to a little room about twelve o'clock, when one of the officers got some rubber hose and struck him with it and also with his fist. They cursed him and demanded that he sign the statement or they were going to beat him to death. He told them that he knew nothing about it, and they told him that they would tell him what to say. This continued for hours. While he promised he would sign the statement, he did this because they were going to beat him to death. He was in fear of his life. An officer told him that they would take him out in a car and throw him out and kill him; that he had killed one and would like to kill another. They told him what to say before calling the clerk to take his statement. They repeated it three or four times. He said exactly what they had told him to say; that he knew that they would beat him to death if he did not do so. He said he did not put anything in there but what they told him to put in. They then took him back to jail about three o'clock in the morning, and the next morning his bond was approved and he was released. A lawyer in Dallas had prepared a bond and sent it to San Antonio where it appears to have been waiting for several days. Upon being released, he went to Mr. Schlesinger, who took him to some parties to observe his condition. They also took him to a photographer and had pictures made of his naked body which

appear in the record and show black and blue bruises at various places from head to foot. These were said to be fresh.

Appellant testified upon cross-examination and re-direct examination that he was released from the penitentiary in 1936; that since said time he had been frequently picked up and placed in jail and carried from place to place and investigated for crimes but was always released; that he was now under indictment in Dallas County on a charge of being an habitual criminal. This charge had been pending for some time but he had never been tried.

A photographer who took the pictures found in the record identified them and said they were taken of the appellant on or about the date of his release. Upon examination, he found bruises all over the right arm, from the shoulder down to the elbow, and the whole right thigh, and then another mark on the left thigh. He testified that they were fresh bruises. The pictures were made at ten o'clock in the morning. This was on June 29th or 30th..

Zeno Smith, a State Ranger assigned to many of the criminal cases throughout the State, testified that he was called into the case by Robinson and Lankford. There is no denial by him or any other officer that the appellant was taken to the places which he stated, but it is further related that they also took him to Seguin and San Marcos. Smith said that they took him to Floresville "because we wanted to question him about this case. We took him to Floresville without leaving word where we had gone." This was on the 24th or the 25th of June. They left at 9:30 o'clock at night. He said the prisoner was kindly treated while they talked to him about the case. They talked to him in the court house and in the jail quarters. They provided no place for him to sleep but offered him a "nice dinner" which he refused. They gave him tobacco and everything he wanted during that time and used no force on him whatsoever. They tried to find somebody who had seen him in that vicinity on or about the date of the burglary but failed to do so. Robinson and Lankford went to Dallas, stayed there a couple of days and then returned. He was continuously in the custody of some of these officers. Finally, the witness related that the prisoner told them that they had been so nice to him and treated him "fairer than any officers ever treated me, and I want to make this statement to you because you have been nice to me." He detailed statements which the appellant made about being in jail at Tyler and other places. After making the statement, he asked the officers if they did not think that was a good

statement; that they told him they wanted nothing but the facts. The witness admits that appellant was taken to a different place and not placed in the Bexar County jail because he understood they had a writ of habeas corpus to produce him in court and that they were evading process by carrying him to these different places.

Charles Fuller, a deputy sheriff in Wilson County, testified that when the prisoner was brought to Floresville, he was taken to the court house and forced to stand up for four or five hours. He sat down part of the time in jail; that he was talked to all day; that at that time he did not see any marks on him or any bruises.

Mr. Sample, a brother of the woman sheriff and who lived with her, told about his (appellant) being there; that they took him to the District Court room and questioned him all night. There were no beds or places to sleep. The prisoner stayed up all night. For twenty-four hours he was not permitted to go to bed.

J. H. Passant, who accompanied other officers to Floresville, detailed about the same transaction but said that they were in the jury room and lay on beds and talked to the prisoner all afternoon; that they left San Antonio at nine o'clock one night and returned there during the next afternoon. He did not know what time, but it was before nine o'clock. He does not recall that the appellant slept. The prisoner was questioned all the time he was with them.

J. C. Lankford was one of the arresting officers. Upon arriving in San Antonio, they stopped at the State Highway Building and questioned the prisoner there. They took him to the Alamo Heights jail and left him, where he stayed from the 20th to the 22nd. He tells the story of questioning the appellant in Floresville and said that he was permitted to sit down when he wanted to; that he was given water several times during the day and offered dinner which he refused; that in all he had been 79 1/2 hours on the job. On the night before appellant made the statement, the witness and his companion returned from Dallas around 11:00 o'clock and went up to the jail, got appellant and took him to the Detectives' Office and talked to him about two hours "before he agreed to make the statement." He said they secured some information in Dallas that helped them; that they let him know that they knew what was going on in Dallas. "Then he agreed to make this statement." They got their information from Breazeale, but they

did not tell what that information was. The witness denies much of the testimony of the appellant. On the morning after the statement was taken, they were served with a writ to have him in court. They went to the jail, brought him by and had him look at the tools which had been found at the scene of the burglary, and had him to identify the tools. (This the appellant said he was forced to do).

G. E. Robinson, another officer who worked with Lankford, testified to the places they had taken the appellant, first to the Alamo Heights jail and then to the county jail. The witness said: "From there we went and took him to Floresville because we heard there was a writ of habeas corpus and they would not be able to locate us and serve the writ. We had not completed our investigation." He denies that they kept appellant standing and punished him in the manner testified about, but admits that they kept him up the entire time. He said they brought him a pitcher of water and gave him Coca-Cola and cigarettes. He denies the use of any force. They also took appellant to New Braunfels and worked back to San Antonio through tourist courts at various places. The witness said: "Based on the information we got in Dallas we questioned Sigler again. We got this confession out of Breazeale here in San Antonio." After they returned, the three officers started questioning him again. The witness further said: "Based on the information we got in Dallas he agreed to make a confession." He again said that appellant told Mr. Smith that "we had been so nice to him that he was going to tell the truth about the whole thing."

Without dispute, these officers kept appellant out of the jail to which it was their duty, under the law and the process in their hands, to deliver him. Without any apparent information on the subject, they took him to various tourists courts to see if any one could recognize him as being there about the time of the burglary. They got no results, and their efforts seem to be trivial, based on no information warranting them in believing that they could secure the information which they say they were seeking. They admit they questioned him. They say, "We got this confession," etc. A confession which officers "get" from a prisoner is not a voluntary confession as contemplated by the statute.

In view of the ever-growing practice of a few arresting officers in the State of Texas to go beyond the bounds of their duty in this respect and the frequency with which such complaints come to this court, it now seems appropriate that we

call attention to the constitutional provisions, both federal and state, on the subject in order that the officers involved may understand and be reminded that this court can hardly write more clearly on the subject than it has in the past.

The Fifth Amendment to the Constitution of the United States provides that no person "shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law."

By the Fourteenth Amendment, it is again provided that no state shall "deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

In Section 9 of Article 1 of the Constitution of the United States, it is said: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

The Constitution of Texas, Section 12, Article 1, provides: "The writ of habeas corpus is a writ of right, and shall never be suspended. The Legislature shall enact laws to render the remedy speedy and effectual."

Our Legislature has enacted what has heretofore been considered adequate procedure, as directed by the Constitution.

The statement of facts in this case makes it clear and plain that the confession introduced in evidence was not voluntarily made; that the officers in charge of the prisoner not only acted without their legal powers and went beyond the duties conferred upon them by law but in utter contempt of the provisions of the Constitution of the United States and of the State of Texas and in disrespect of the court which they are charged by law with serving.

In the recent case of Chambers, et al v. State of Florida, decided by the Supreme Court of the United States on February 12, 1940, it is made clear that a federal question is raised by which that court will take jurisdiction. Under the circumstances of that case it was held that the confession was not voluntarily made but came after relentless efforts upon the part of the officers to "break" the prisoner's will and render them helpless to resist their accusers further. The court said: "To permit human lives to be forfeited upon confessions thus obtained would make of the constitutional requirements of due process of law a meaningless symbol."

Regardless of the end to be obtained, the means used in that case was denounced. It was said further: "Under our constitutional system courts stand against any winds that blow as havens of refuge for those who might otherwise suffer because they are helpless, weak, outnumbered, or because they are non-conforming victims of prejudice and public excitement. Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death. No higher duty, no more solemn responsibility, rests upon this Court, than that of translating into living law and maintaining this constitutional shield deliberately planned and inscribed for the benefit of every human being subject to our Constitution—of whatever race, creed or persuasion."

Our Constitution provides for an inquisitorial body legally clothed with cautious procedure and sufficient power, known as the grand jury. No such authority is vested in any arresting officer and wise is that provision. If the admitted conduct in this case is to be tolerated, we had as well scrap our Constitution and suspend our statutory laws and delegate all authority in such matters to the individual, or group of individuals, whether with gun on the hip or lash in the hand, who happen to receive a commission as a peace officer. Such action as that revealed in this case cannot receive judicial sanction.

In the case of Blackshear vs. State, 95 S. W. (2d) 960, Judge Hawkins quoted from State v. Miller, 111 Pac. 1053, with approval, as follows: "Neither policeman, detectives, nor jailers are clothed in this country with inquisitorial powers. It is true that some of the laws of Spain have been ingrafted on ours; but not the dungeon, the bludgeon, the burning faggot or any of the concomitant tortures of the Inquisition. These belong to the ages of bigotry, intolerance, and superstition, and have no place in our civilization. An attempt to revive them, even in mild form, ought to call forth the execration of the people, and the severest condemnation of the law."

Following the Blackshear case, this court had a very similar state of facts before it in Abston v. State, 102 S. W. (2d) 428. It is there said that proof showing the confession was voluntary is essential to admit it in evidence. On the State's motion for rehearing, Judge Hawkins called attention to the two articles of the statute hereinafter quoted and also to Article 1157 of the Penal Code providing punishment for officers found guilty of extorting confessions by certain mis-

treatment and prescribing their disqualification to forever thereafter hold office in this State.

If the officers of the State, charged with the solemn duty of keeping the peace and bringing to the bars of justice those who violate the laws, do not themselves respect the basic laws of the land, it becomes for us a sad day. The above quotation may well be announced, as it was in the Blackshear case, as a fixed policy of this court.

What power or authority had the arresting officers in this case other than that which was specified in the warrant placed in their hands? What right had they to subject the appellant to the gruelling examination for hours and days as they themselves admit? Where is the law authorizing an officer to evade the process of the court of which he is a part? If the officers of our State do not themselves respect the laws, they forfeit all right and authority in their commission to enforce them. The admitted act of the officers in this case who testified that they evaded a process declared by our Constitution to be a writ of right, a sacred protection to the liberty of our citizens, is a violation of the oath of office which they took to support the Constitution of the United States and of the State of Texas. How they could appear in court with such admissions and expect their testimony to be accepted is inconceivable.

Article 726, C. C. P., provides that "the confession of a defendant may be used in evidence against him if it appear that the same was freely made without compulsion or persuasion, under the rules hereafter prescribed."

Article 727, C. C. P., prohibits the use of a confession "unless made in the voluntary statement of accused," reduced to writing and signed by him.

The authorities holding that confessions obtained by threats or made from fear are inadmissible are sufficiently clear to require that the court, in this case, hold the purported confession inadmissible as evidence against the appellant. Simmons v. State, 296 S. W. 513; Hernandez v. State, 8 S. W. (2d) 947; White v. State, 248 S. W. 690; Kelley v. State, 269 S. W. 796; Thompson v. State, 63 S. W. (2d) 849; Blackshear v. State, 95 S. W. (2d) 960; 20 Amer. Jur., p. 433, secs. 501 and 518; Wharton's Crim. Ev., (11th Ed.) Vol. 2, p. 1019, sec. 608; 24 Amer. Law Rep. 703, (annotations); Jackson v. State, 97 S. W. 312; Chambers v. Florida, Vol. 84, No. 8, Advance Sheets, U. S. Sup. Ct.; Abston v. State, 102 S. W. (2d) 428.

We need not rely upon the statement of the appellant him-

self detailing the horrible experience which he was forced to endure, although he is strongly corroborated by the photographer and the pictures which were introduced in the case. The admission of the officers themselves, all of whom were called by the prosecution, is sufficient to require that this court reverse the case and remand it for a new trial, which is accordingly done.