# JUNE 16, 1943

FRANASCO CAVAZOS V. THE STATE.

No. 22535. Delivered June 16, 1943.

The opinion states the case.

*S. P. Nielsen,* of Raymondville, for appellant.

*Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

The appeal is from a thirty year sentence on a charge of murder. In a former conviction appellant was assessed a penalty of thirty-five years, which was reversed by this court (160 S. W. (2d) 260).

The former opinion is here referred to for a statement of facts of the case and of the law under the record as made in that trial. The appellant's story of being taken in custody without a warrant for his arrest and carried out of the county of his residence to Kingsville, Kleberg County, where he was kept for about two weeks, and his story of mistreatment is the same as that given in the first trial. As stated in the opinion herein

referred to, this story was not contradicted by anyone at the first trial, probably on the theory that it made no difference what happened to him at the time he was forced to sign the first confession because it was shown that he had thereafter signed the second one which was offered in evidence against him and relied upon by the State. Great emphasis was laid on appellant's testimony that he was forced to stand on tin cans for a number of hours, resulting in his feet being in a very bad condition, and this same testimony was given in the second trial. To rebut his story of mistreatment, the State produced witnesses who observed him walking into the court house at Raymondville upon his return from Kingsville. The county health officer testifies on the second trial that upon his return to Raymondville he had the prisoner stripped and examined him from head to foot and found no evidence of mistreatment. The district clerk testifies to visiting the prisoner as a news reporter and taking numerous pictures of his body, one of which was introduced and shows the bottom of his feet. This was prior to the second confession. His story of punishment was denied by the two rangers who were alleged to be the chief actors in securing the first confession, and thus an issue of fact arose as to the voluntary nature of the first confession unless the story of the officers as to what did occur took that issue out of the case, to the advantage of appellant.

If there is an issue of fact for the jury to pass on relating to the voluntary confession first obtained and the jury should find that issue in favor of the State's contention, then all taint on the second confession would naturally be removed and the State would not have the burden pointed out in the opinion on the first appeal. On the other hand, if the first confession is held to be an involuntary one the State would approach the second confession with the burden of showing that it was not produced by the influences which forced the first confession, and a charge thereon would be required in submitting the case to the jury. The trial court failed to give this charge, evidently taking the view that the jury's finding as to the first confession would eliminate the necessity therefor. Therefore, we must consider the facts relative to the first confession as testified to by the officers themselves in order to determine whether or not that was a voluntary confession and entitled to be considered by the jury.

In the state of the evidence it is not a matter of concern with this court as to whether or not appellant told the truth about what occurred. His entire statement may be false. Never-

theless, the statement of the officers produced by the State is sufficient to show a coercion making the statement inadmissible under the many holdings of this court and of the Supreme Court of the United States, construing the provisions of the State Constitution and of the Federal Constitution prohibiting any procedure which would compel a party accused of crime to give testimony against themselves. A review of the testimony given by the officers will suffice to support this conclusion.

W. E. Riggs, State ranger, testified that he was stationed in Raymondville and made an investigation of the Cavazos case. He took him into custody while in Raymondville at the court house, having arrested him in his capacity as a State ranger. This was on May 19th. He immediately took him to Kingsville and the next day went to San Antonio. On May 22nd he left him in jail at Kingsville while he returned to Hidalgo County to make further investigation and next returned on June 8th, during all of which time appellant was left in the Kleberg County jail. He then denies generally and specifically everything which appellant testifies that the rangers did to produce a statement but affirmatively states that they kept the prisoner under constant questioning from early afternoon of June 8th until about two or three o'clock the next morning. He sat him down and placed before him the skull of the deceased, at the sight of which appellant said "I will tell you about it," and he did make the statement. On cross examination he admitted that he did not take him to a magistrate when arrested and had no warrant for his arrest but carried him out of the county, saying it was for the purpose of making an investigation. He took him to San Antonio to a lie detector machine. This was in accordance with his usual custom, saying: "I take them any place I please, and I did that in this case." Other officers with him assisting in questioning the accused were Ranger Joe Bridge, Travis Peeler, Clarence Barnes, Henry Timmerman, and Jim Scarborough. Bridge, the other ranger, met him there by appointment for that purpose. Others were officers who wore guns. He further testified:

"We took him in a room there, and myself and my helpers started questioning him; the questioning continued until about two or three that morning. Somebody was questioning him continuously; what time I didn't somebody else did. When one of us ran out of breath, somebody else would take over, that's right. We questioned him until about two or three o'clock before he started saying something.

"* * * I don't remember whether the prisoner ate or not. I don't know whether he asked for anything to eat. I don't think

he did. As to whether he asked for water, we gave him water; I know that, I went out and got it once myself. You asked me whether, during this ten or twelve hours of continuous questioning, I just asked him all the time whether he had anything to do with it; I asked him that many times, yes. As to whether I just repeated it over and over again, I couldn't tell you the exact words we used. I told him he would be better off to tell the truth; sure, I told him that. I did not tell him if he did not confess, something would happen to him. I never made any threats to him.

"* * * You ask me what made him finally break, whether I think the continuous questioning did it; yes, that, and we had that skull there before him, and we were standing there before him. As to whether I think that skull scared him into it; I think that had a lot to do with it. I wouldn't say that we eventually talked him out of it - - - he eventually confessed. That was brought about by our continuously questioning him until he finally broke."

The witness testified that he considered this a voluntary statement. He did not consider duress at all and that was his custom. He further says:

"I have handled quite a number of criminal cases; many a one; and when I think I have the right man, I try to get a confession. When I can't get one real quick, I use all efforts that I think are alright to get one, yes; and that includes questioning them for ten or twelve hours if necessary."

Joe Bridge, the other ranger, testified to about the same thing, saying that the questioning began some time after one o'clock; that there were two or three officers with him at all times—all peace officers with guns. Somebody questioned the prisoner all the time. "The prisoner was standing up; I believe he stood up all evening. He wasn't standing up against the wall; he was just standing there in the room. * * * We did get results this time."

He says the questioning was continuous most of the time. There were a couple of beds in the room where the officers lay down when they needed rest. Further: "We just kept on questioning him and he finally broke. You ask whether I figured that if I did question him long enough he would finally make a statement; they most usually do. By that I mean that if you have enough information, they generally do." He says the prisoner was then taken back to Raymondville; that soon thereafter, the

district attorney wanted him to make a second statement and asked the witness, Ranger Bridge, to talk to him, which he did. The district attorney didn't request the witness to talk the accused into making another statement but "just asked me to ask him to make it, and he said he would." No threats were made to secure the other statement.

The record reveals that the cautious district attorney desired another statement made to him under conditions with which he would be familiar. This was done and this is the statement which was introduced in evidence to corroborate the testimony of the witness who took part in the crime and detailed the story of the murder. The State introduced no evidence to show that the mind of the prisoner had been relieved of any pressure brought upon him at Kingsville. It therefore occurs to the writer that the requested charge, in keeping with the holding of this court on the former appeal, is not called for but that both confessions are inadmissible. If the first confession was obtained under duress, the State made no attempt to discharge its burden (as held in the former opinion). As heretofore stated, we find ourselves relegated to the sole question as to whether or not the statement of the officers—considered alone and independent of the testimony of appellant—showed that the first confession was a voluntary one or that it was produced by an influence which would relieve it of its voluntary nature.

Whatever is said about their testimony must be considered free of any criticism of the acts of the officers who apparently were moved by great zeal and with good intentions, neither of which will suffice to change the legal aspects of the case. We must consider it as we find it and as detailed by the officers themselves.

The principal case relied upon by appellant to support his contention that the statement made by him at Kingsville was not a voluntary one is McNabb v. United States, 63 S. Ct. 608, 87 L. Ed. 819, in an opinion by Mr. Justice Frankfurter of the Supreme Court of the United States. We are not in accord with the vitriolic denunciations found in that opinion but we are confronted with the conclusion reached and it is not in conflict with the many holdings of this court on the subject. It presents a state of facts sufficiently similar in the legal aspect to cover the question necessary for us to decide in this case.

The McNabbs, brothers, cousins, and uncles, were a clan of Tennessee mountaineers living twelve miles from Chattanooga

in a community known as the McNabb settlement. Federal revenue officers learned that they were to deliver a quantity of liquor at night and undertook to intercept it and to arrest the offenders who had not paid the tax on the liquor. They found the parties delivering the liquor in the dark, with the fatal result that one of the officers was killed. An investigation followed. Several of them were taken into custody by the officers who failed to carry them to a commissioner as directed by Federal law. They were detained and questioned intermittently, as the officers rotated from one to the other for about fourteen hours. The petitioners were in a room where they had no place to sit or lie down except on the floor. They were given sandwiches, not permitted to see relatives or friends who attempted to visit them, or to have counsel. These boys were born and grew up in that community without opportunity for schooling beyond the fourth grade. They had never been farther away than a village about eighteen miles distant. Some were taken to the scene of the killing and confronted with certain physical facts. Each was told of the statements which the others had made and cross questioned and examined again and again. About six officers were present while one did the questioning. They were advised that the officers were of the Federal government investigating the offense; that they did not have to make a statement and need not fear any force; that any statement could be used against them and that they did not have to answer any question. They would send them to jail and then return them for questioning—how many times, they did not know. None of this was disputed by the parties. The government contended that under such statement of fact the confessions were voluntarily made and that the admission of such statements at their trial was not in contravention of the Fifth Amendment to the Constitution of the United States. It is not necessary to follow the reasoning in that opinion, some of which we cannot consider appropriate. The effect of the opinion holding that this evidence is not admissible under the Constitution of the United States is sufficient to sustain appellant's contention in the case at bar.

Another opinion by Mr. Frankfurter, decided the same date, is Anderson v. United States, reported in 63 S. Ct. 599, 87 L. Ed. 829. The question of law is the same and the procedure securing the evidence from the accused parties was similar. The opinion is consistent with that in the McNabb case.

It will not be necessary to review all of the opinions of this court on the subject. They are plain and consistent. Article 727, C. C. P. prohibits the use of a confession "unless made in the

voluntary statement of accused," reduced to writing and signed by him. It is not helpful to discuss the nature and amount of force required to be proven to divest a confession of its voluntary nature. Indeed this may not be done, for one cannot look into the mind of another and know his reaction to persuasion, persistent accusations, and threats. The mere presence of officers with guns on them would be sufficient to create great fear in some people, particularly if held in custody by them, while it might be a commonplace experience for others. The degree of fear which would be required to move one individual to action might be insufficient to make any impression on another.

Article 1157 P. C., passed by the Legislature for further enforcement of the true intent and meaning of our Constitution, says:

"Any sheriff, deputy sheriff, constable, deputy constable, Texas ranger, city marshall, chief of police, policeman, or any other officer having under arrest or in his custody any person as a prisoner who shall torture, torment or punish such person by inflicting upon him any physical or mental pain for the purpose of making or attempting to make such person confess to any knowledge of the commission of any offense against the laws of this State, shall be fined not less than one dollar nor more than one thousand dollars or be imprisoned in jail not to exceed one year, or both such fine and imprisonment, and in addition thereto the jury may state in its verdict that the defendant should never thereafter be allowed to hold any office of profit or trust under the laws of this State, or any subdivision thereof, nor any city or town thereof. Should the jury so state in its verdict, the court trying said case shall render judgment in accordance with said verdict and thereafter the defendant shall forever be barred from holding any such office. (Acts 1923, p. 269)."

It requires no treatise in this opinion to convince one that appellant suffered mental pain during the processes testified to by the officers or that he was "tormented," all for the purpose of making him confess. The amazing frankness with which two Texas rangers came into the court house and detailed a story of their own conduct in this case and of their common practice throughout the country in that respect would warrant an additional discussion to that which we are giving. This court has treated the question in various phases in the following cases:

Simmons v. State, 107 Tex. Cr. R. 504, 296 S. W. 513; Hernandez v. State, 110 Tex. Cr. R. 159, 8 S. W. (2d) 947; White

v. State, 93 Tex. Cr. R. 532, 248 S. W. 690; Kelley v. State, 99 Tex. Cr. R. 403, 269 S. W. 796; Thompson v. State, 124 Tex. Cr. R. 440, 63 S. W. (2d) 849; Blackshear v. State, 130 Tex. Cr. R. 557, 95 S. W. (2d) 960; Jackson v. State, 50 Tex. Cr. R. 302, 97 S. W. 312; Abston v. State, 102 S. W. (2d) 428, (same case 141 S. W. (2d) 337 and 123 S. W. (2d) 902); Allgood v. State, 148 S. W. (2d) 433; Sigler v. State, 139 S. W. (2d) 277; Ward v. State, 158 S. W. (2d) 516, reversed by the Supreme Court of the United States, 62 S. C. R. 1139.

A knowledge of and respect for the Constitution of Texas and of the United States and of the decisions of this court in respect to the matter under consideration on the part of the law enforcement officers of the State would greatly facilitate the suppression of crime and add stability to the government to which we are now clinging with all human tenacity. May it again be said that "Our Constitution provides for an inquisitorial body legally clothed with cautious procedure and sufficient power, known as the grand jury." No officer has the right to ignore statutory directions to secure a warrant for parties whom he holds in custody charged with crime. When he fails to do this, he does not necessarily forfeit all right to utilize the evidence revealed in the trial of the party, but he certainly does put himself to an undue disadvantage. No recommendation can be more fundamental than that the officers of our land strictly obey the laws that they are endeavoring to enforce. In the event of another trial, the evidence surrounding the taking of the second statement may be different. In such event, consideration should be given to the charge in compliance with the holding of this court on the first appeal. From the State's brief on that subject, we quote the following: "We are inclined to the view that the court should have instructed the jury that if they found, under all of the facts, that the first confession was involuntary, then it was presumed that the same influences dominated the giving of the second confession and the burden was on the State to overcome such presumption, and then follow such instruction by the general instruction dealing with whether or not confessions are voluntary, presenting by the wording of the charge the burden upon the State." We are in accord with this view. It is substantially so stated in the opinion by Judge Hawkins in Hernandez v. State, 8 S. W. (2d) 947. The court should instruct the jury as a matter of law that if a first confession was involuntary; that the presumption obtained that the second confession was produced by the same influence, unless and until the State had overcome that presumption by evidence which a jury should find beyond a reasonable doubt. In the

absence of some evidence to that effect the second confession should be excluded along with the first one. There would be no issue for the jury and the party would be entitled to an instructed verdict, unless other evidence should develop sufficiently corroborating that given by Manuel Montalvo.

The judgment of the trial court is reversed and the cause remanded.