

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0551-10

---

### WILLIAM THOMAS LEONARD, Appellant

### v.

### THE STATE OF TEXAS

---

### ON DISCRETIONARY REVIEW
### FROM THE ELEVENTH COURT OF APPEALS
### TARRANT COUNTY

---

*Womack, J., delivered the opinion of the Court, in which Price, Johnson, Cochran, and Alcala, JJ., joined. Johnson, J., filed a concurring opinion, in which Cochran, J., joined. Keasler, J., filed a dissenting opinion, in which Keller, P.J., and Hervey, J., joined. Meyers, J., did not participate.*

### <u>Opinion on Rehearing</u>

We withdraw our opinion of March 7, 2012, and issue this opinion in its place.

The appellant's deferred-adjudication community supervision was revoked based on the

results of polygraph examinations. The Court of Appeals held that this evidence was

inadmissible, and therefore the trial court abused its discretion. We shall affirm the Court of

Appeals.

## I. Background

## A. Trial Court Proceedings

The appellant was indicted for aggravated sexual assault. In November 2004, he pled guilty to injury to a child and was placed on deferred-adjudication community supervision for five years. After several amendments, the terms of the appellant's community supervision included two provisions relevant to this appeal:

> Submit to sex offender treatment and evaluation as directed by the supervision officer. Attend and participate fully in and successfully complete psychological counseling, treatment, and aftercare sessions for sex offenders with an individual or organization as specified by or approved by the Court or the supervision officer. Pay all costs of evaluation, counseling, treatment and aftercare. Treatment must be completed within three years of its initiation, with at least one-third of treatment completed each year.

And:

> Must submit to, pay all costs for, and show no deception on any polygraph examination and other diagnostic test or evaluation as directed by the court or supervision officer.

In October 2008, the State petitioned the trial court to proceed to adjudication, alleging that the appellant had violated three terms of his community supervision.[1] In the first count, the State alleged that the appellant had violated the "Sex Offender Treatment" condition in two ways:

---

[1] When a defendant is placed on deferred adjudication community supervision, he pleads guilty, but the trial court defers any adjudication of guilt. If the defendant is found to be in violation of the terms of his community supervision, the trial court may proceed to adjudicate him guilty in accord with his plea. Thus in such cases the hearing on whether the defendant violated the terms of community supervision may be called an "adjudication hearing," but it is governed by the same rules as a hearing to revoke community supervision and is, in practical terms, a hearing on whether to revoke the defendant's deferred adjudication community supervision. *See* TEX. CODE CRIM. PROC. art. 42.12 § 5(a)-(c).

Throughout this opinion, we will use the terms "adjudication" and "revocation" in such a manner as to reflect the fact that adjudication hearings are a subset of revocation hearings.

a) In violation of this condition, [the appellant] was unsuccessfully discharged from sex offender treatment, on or about October 21, 2008.

b) In violation of this condition, [the appellant] failed to complete one-third of sex offender treatment at Michael Strain and Associates within the first year.

In the second count, the State alleged that the appellant had violated the "Polygraph" condition:

In violation of this condition, [the appellant] submitted to polygraph testing and revealed significant criteria indicative of deception, on or about [April 11, 2008, and December 12, 2007].

In the third count, the State alleged that the appellant had not promptly paid his assessed fine and supervision fees.

At the adjudication hearing, the appellant pled not true to the first and third counts, and the State waived the second count. The State presented two witnesses: Dr. Michael Strain and the appellant's probation officer.

Strain was a psychotherapist in whose program the appellant had been enrolled until Strain discharged him from the program. When the State asked Strain why he had discharged the appellant, the appellant objected, citing two cases from this Court that had held that, because polygraphs were unreliable as a matter of law, the results of polygraph examinations were inadmissible.[2] The trial court then asked Strain to answer the question. Strain said that he had discharged the appellant "because he had failed five polygraphs." The appellant renewed his objection; the trial court overruled it, granting the appellant a running objection to all polygraph testimony. When Strain resumed testifying about polygraph results, the appellant requested a

---

[2] *See Romero v. State*, 493 S.W.2d 206, 213 (Tex. Cr. App. 1973) ("[T]he results of polygraph tests should not be received into evidence, over objection, even if there had been a prior agreement or stipulation" by the parties to admit the results); *Tennard v. State*, 802 S.W.2d 678, 683 (Tex. Cr. App. 1990) ("The existence and results of a polygraph examination are inadmissible for all purposes.").

*Daubert*[3] hearing to test the validity of the polygraph results. After a lengthy discussion with defense counsel, the trial court held in abeyance the motion for a *Daubert* hearing and never revisited the matter.

Strain then proceeded to testify that he had discharged the appellant from treatment because he believed that the appellant was not being truthful with him. The appellant had failed three polygraphs prior to April 2007, at which point the appellant "made several admissions" and "cleared" a polygraph.[4] After that "cleared" polygraph, the appellant then failed five polygraphs, three of which "questioned him if he had had sexual contact with children, if he had done a sex crime or if he had isolated children," and two of which "asked only if he had had sexual contact with children or done a sex crime." Strain said that he believed these polygraph results showed that the appellant was engaged in "secret keeping."

Strain said that he had no basis, other than the failed polygraphs, to discharge the appellant from the program or to believe that the appellant was being dishonest. The appellant was making satisfactory progress,[5] the appellant attended all required sessions, and there was no reason other than the polygraphs to believe the appellant had committed any offenses. Strain testified that he did not conduct the polygraphs, but he did not say who did or give any information about the polygrapher. Strain did not testify as to what specific questions the

---

[3] *See generally Daubert v. Merril Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[4] When the State asked what the April 2007 admissions were, the appellant objected on the basis that there was no connection between the 2007 polygraphs and the five polygraphs for which the appellant had been discharged from the program. The trial court sustained that objection.

[5] Strain said that while the length of his program might vary from patient to patient, his normal schedule was a three-year program, with patients expected to complete one-third of the program each year. Strain said that the appellant had completed one-third of the program in the first year and was on schedule for the second year of the program at the time Strain discharged him.

appellant was asked or what answers the appellant gave, nor did he provide any details on how the polygraphs were conducted. Strain said that the appellant was the only patient in the history of his clinic to have been discharged solely for failing polygraph examinations. According to Strain, each time prior patients had failed this many polygraphs, there had been other violations of the conditions of therapy.

The appellant's community-supervision officer then testified that the appellant had failed to pay some of his supervision fees on time, but had eventually paid the fees. During cross-examination, defense counsel seemed to have elicited that the periods in which the appellant was behind on his fees corresponded to periods of unemployment.

After this testimony, the parties rested. The State waived the third count of the motion to adjudicate, leaving only the first count.

In his argument, defense counsel observed that Strain had testified that the appellant had completed one-third of his treatment in the first year, showing that count 1b was not true, and that the only possible basis for revocation was count 1a. Defense counsel then argued that Strain's testimony regarding polygraph results was "*per se* inadmissible." While polygraphs might be acceptable tools for therapists to use during therapy, they could not be "the only reason for putting a man in the penitentiary …."

In issuing its ruling, the trial court distinguished "between admitting polygraphs outright to show that someone did or did not tell the truth and … considering them as the basis of an expert opinion as to whether someone poses a danger and a risk to this community …." The trial court then explained that it was

very concerned that if polygraphs cannot be considered as a tool by the expert who

receives them to be able to monitor someone on sex offender probation in this community, then we'll be losing a valuable tool to monitor someone's honesty, which is the crux of allowing people to continue … in the community on sex offender probation when they obviously have shown that they are a danger to children in the past.

The trial court found count 1a to be true and count 1b to be false. It then adjudicated the appellant guilty of injury to a child and sentenced him to seven years' confinement.

## B. Court of Appeals

## 1. Arguments of the Parties

The appellant brought five points of error to the Eleventh Court of Appeals. In three points he argued that the trial court erred by admitting and considering the polygraph testimony, and without this testimony there was insufficient evidence to show that the appellant had violated the terms of his community supervision. In a fourth point, the appellant argued that the trial court erred in denying his request for a *Daubert* hearing. In his final issue, the appellant argued that the polygraph results were inadmissible hearsay because Strain did not conduct the polygraph examinations.

The State made two arguments for admitting the polygraph results. First, under Rule of Evidence 703, "the facts or data" upon which an expert bases his opinion "need not be admissible in evidence." The State argued that the import of Strain's testimony was not that the appellant failed polygraphs, but that an expert had formed the opinion that the appellant was not being truthful, and, on the basis of this opinion, had discharged the appellant from his treatment program.

In its second argument for admissibility, the State argued that because requiring the appellant to take polygraphs and "show no deception" was a valid condition of his community

supervision, the results of the polygraphs must be admissible or else there would be no way for the trial court to enforce the condition. "Requiring that Appellant 'show no deception' on the polygraph is just a logical extension of the already permissible condition of submitting to a polygraph as part of community supervision." While acknowledging this Court's longstanding rule that polygraph results are inadmissible, the State said that this created a "conundrum" for trial courts that imposed polygraph examinations as a condition of community supervision.

In a third point, the State argued that the appellant's request for a *Daubert* hearing was not preserved for review because the trial court never made a final ruling on the matter.

## 2. Opinion of the Court

Characterizing the adjudication proceeding as "trial by polygraph," the Court of Appeals sustained the appellant's first three points of error and reversed the trial court.[6] The Court of Appeals rejected the State's Rule 703 argument by noting that the reason polygraph results are inadmissible is because "the Court of Criminal Appeals has determined that, as a matter of law, they are unreliable."[7] Thus, even if the polygraph results were the basis for an expert's opinion, the trial court did not have the discretion to consider them. Because the failed polygraph examinations were the sole basis for Strain's opinion that the appellant was being dishonest, that opinion was itself inadmissible evidence from the polygraph examinations.

The Court of Appeals did note, however, that there was a "paradox" regarding polygraphs, because a trial court had the authority to require polygraph examinations as a condition of community supervision, but the results of those court-ordered polygraph

---

[6] *Leonard v. State*, 315 S.W.3d 578, 581 (Tex. App.–Eastland 2010).

[7] *Id*., at 580.

examinations may not be shown to the trial court.[8] The Court of Appeals seemed to resolve this paradox at the end of the opinion by suggesting that while the results of polygraphs are inadmissible, the fact that a defendant failed to take a court-ordered polygraph could be admissible at a revocation hearing.

## II. Discretionary Review

We granted the State's petition for discretionary review on five grounds. The first four grounds for review reassert the State's Rule 703 argument and ask whether the Court of Appeals erred in holding that our cases stating that polygraph results are inadmissible "for all purposes" should take precedence over Rules 703 and 705, which, respectively, allow an expert to base his opinion on inadmissible information and to explain to the trial judge the basis for his opinion even if the information is otherwise inadmissible. In its fifth ground for review, the State asks whether the Court of Appeals "err[ed] in holding that polygraph results are always inadmissible notwithstanding a valid condition of community supervision [requiring that] the Appellant submit to and show no deception on a polygraph examination …."

## III. Abuse-of-Discretion Review

Before we address the arguments of the parties, we first address a point passed over by the parties and the Court of Appeals. The arguments both to us and the Court of Appeals deal with the admissibility of the fact that the appellant failed five polygraphs examinations and whether an expert may base an opinion solely on the results of polygraph examinations. But the trial court did not adjudicate the appellant's guilt based on the failed polygraph examinations. Although the State initially pled the failed polygraph exams as a basis for adjudication, it

---

[8] *Ibid.*

abandoned that allegation before the hearing began.

The appellant was adjudicated guilty because he failed to complete a sex-offender treatment program. The only issue for an appellate court in this case is whether the trial court abused its discretion in proceeding to adjudication.

The basic facts relevant to that matter do not seem to be in dispute. A condition of the appellant's community supervision was that he "successfully complete psychological counseling, treatment, and aftercare sessions for sex offenders with an individual or organization as specified by or approved by the Court or the supervision officer." The individual in whose treatment program the appellant was enrolled testified that the appellant was discharged from the program without successfully completing it.

This appeal has been merely about the admissibility of evidence regarding *why* the appellant was discharged. Is that even relevant to determining whether the trial court abused its discretion?

During the adjudication hearing, the trial court seemed interested in this question. At one point, the trial court asked defense counsel:

> If we were to proceed hypothetically [and] Mr. Strain got up here and said, "I discharged him," and that's all he can say because it's based on polygraphs which are inadmissible, would you feel like that would be the way to proceed in this case? … [D]ischarge is a violation of his probation, and if it's proved to me by a preponderance [of the evidence] that your client was discharged, the Court has the ability, as you well know, to revoke his probation and send him to prison. Now, we can either explore the reasons for that or we cannot.

In a revocation proceeding, the trial court has discretion to revoke community supervision when a preponderance of the evidence supports one of the State's allegations that the

defendant violated a condition of his community supervision.[9] Though defendants are not entitled to community supervision as a matter of right, once a defendant is assessed community supervision in lieu of other punishment, this conditional liberty "should not be arbitrarily withdrawn by the court …."[10] On appeal from a trial court's decision to revoke, therefore, appellate courts review the record only to ensure that the trial court did not abuse its discretion.

Upon close examination, however, it is not obvious how an abuse-of-discretion standard applies in this case. The trial court ordered the appellant to "[a]ttend and participate fully in and successfully complete" a program. The evidence at the adjudication hearing showed that the appellant did "[a]ttend" and "participate fully" in the program, both of which were within his power to do. The appellant did not have full control over his ability to "successfully complete" the program, however; he was discharged because the therapist came to believe that he was being dishonest. Thus it was the therapist's discretion that caused the appellant to be in violation of a term of his community supervision.

As the trial court suggested, under an ordinary abuse-of-discretion review, our analysis would already be over: Discharge caused the appellant to be in violation, and there was evidence that the appellant was discharged. Such an analysis on our part, however, would be inadequate.

Revocation involves the loss of liberty and therefore implicates due process.[11] "The central issue to be determined in reviewing a trial court's exercise of discretion in a [community

---

[9] *See Scamardo v. State*, 517 S.W.2d 293, 298 (Tex. Cr. App. 1974); *Caddell v. State*, 605 S.W.2d 275, 277 (Tex. Cr. App. 1980).

[10] *DeGay v. State*, 741 S.W.2d 445, 449 (Tex. Cr. App. 1987).

[11] *Caddell*, 605 S.W.2d, at 277.

supervision] revocation case is whether the [defendant] was afforded due process of law."[12] It would surely offend due process if a defendant were discharged from his therapy program for a wholly inappropriate reason – such as illegal discrimination or mere caprice – and the bare fact of that discharge were used as a basis to revoke the defendant's community supervision. Yet, by an ordinary abuse-of-discretion review, such a revocation would be sustained.

What has happened here is that the trial court, through a condition of the appellant's community supervision, made the appellant's compliance with the terms of his community supervision subject to the discretion of a third party. In such a case, to determine whether the trial court abused its discretion we must also examine the third party's use of its discretion to ensure that it was used on a basis that was rational and connected to the purposes of community supervision.[13]

With the standard of review explained, the issues in this case become clearer. If the polygraph results were inadmissible, then the record would not contain a basis for Strain's decision to discharge the appellant, and the trial court abused its discretion by adjudicating the appellant guilty.

### IV. Polygraph Evidence

The history of this Court's dealings with polygraph evidence is long but not very complicated. For more than sixty years, we have not once wavered from the proposition that the results of polygraph examinations are inadmissible over proper objection because the tests are

---

[12] *DeGay*, 741 S.W.2d, at 450.

[13] *See* TEX. CODE CRIM. PROC. art. 42.12 §11(a) ("The judge may impose any reasonable condition that is designed to protect or restore the community, protect or restore the victim, or punish, rehabilitate, or reform the defendant.").

unreliable.

Our first discussion of the reliability of "'lie detector' tests" was a passing note in *McKay v. State*.[14] In that case, a defendant charged with driving while intoxicated challenged the admissibility of a "Harger Drunkometer" test that showed his blood alcohol level to be .27. After we affirmed the conviction, McKay asked for rehearing. As examples of appellate courts disallowing scientific evidence when scientists were "not generally agreed" regarding the reliability of the evidence, he cited several cases from other states holding that "lie detector tests" were inadmissible. Though the issue of lie detectors bore little relation to the case then before us, we stated that we were "in accord with such holdings, and until such tests can be shown to fairly show the guilt or innocence of an accused, we see no reason for their introduction in evidence."[15]

In *Peterson v. State*, we weighed in on the admissibility of lie detector results in a more relevant context.[16] Peterson had sought to call as a witness "one D.E. Wheeler, the operator of the Keeler polygraph, or lie detector machine, for the Texas Department of Public Safety," in order to have Wheeler "testify as to the facts observed by him in the giving of such test to the

---

[14] *McKay v. State*, 235 S.W.2d 173, 176 (Tex. Cr. App. 1951) (op. on motion for reh'g). Prior to *McKay*, we had mentioned the use of "lie detector" machines in criminal investigations, but the admissibility of the results does not seem to have been an issue. *See, e.g., Lott v. State*, 148 S.W.2d 1102, 1103 (Tex. Cr. App. 1941) (Kendall County theft suspect taken to San Antonio "for the purpose of having the lie detector used on her."); *McCumber v. State*, 160 S.W.2d 73, 73 (Tex. Cr. App. 1942) (Willacy County man suspected of receiving and concealing stolen property "was taken to San Antonio, and there subjected to a trial by a 'lie-detector' machine, but such machine failed to work when applied to appellant."). *Cavazos v. State*, 172 S.W.2d 348, 349 (Tex. Cr. App. 1943) (Texas Ranger took Willacy County murder suspect "to San Antonio to a lie detector machine."); *Loya v. State*, 172 S.W.2d 508, 509 (Tex. Cr. App. 1943) (Willacy County murder suspect "taken to San Antonio and placed before what was called a 'lie detector.'"); *Prince v. State*, 231 S.W.2d 419, 420 (Tex. Cr. App. 1950) (Panola County "uxoricide" suspect "was carried to Austin, a distance of 280 miles, where he was subjected to the 'lie detector' test at the Department of Public Safety.").

[15] *McKay*, 235 S.W.2d, at 176.

[16] *Peterson v. State*, 247 S.W.2d 110 (Tex. Cr. App. 1952).

defendant."[17] The trial court had excluded the testimony because "the facts concerning the test would invade the province of the jury and constituted a mere expression of opinion as to the guilt or innocence of the defendant."[18] Though we held that the appellant had not properly preserved the matter for our review, we went on to note "that this Court has not yet authorized the admission of such evidence on behalf of the State, and, until this is done, it cannot be admitted on behalf of the defendant."[19]

Several cases over the next decade cited back to this apparent dictum in *Peterson* as a holding of the Court. In *Stockwell v. State*, after determining that there had been enough evidence to require the trial court to hold a hearing on juror misconduct, we noted that the misconduct in the case – reading a newspaper article that implied the defendant had failed four lie detector tests – was particularly harmful because lie detector results were inadmissible.[20] In *Davis v. State*, we held that the trial court erred in not granting the defendant a hearing outside the presence of the jury regarding the voluntariness of his confession.[21] After the trial court had denied Davis's motion for a hearing, he had presented evidence of the voluntariness of his confession, including the fact that he failed two polygraph examinations, to the jury. At the end of the opinion, we noted that we were not "condemning the use of the polygraph as a means of interrogation," but "upon another trial, the testimony which in effect revealed the results of the polygraph tests

---

[17] *Id.*, at 111.

[18] *Ibid*.

[19] *Ibid.*

[20] 301 S.W.2d 669, 671 (Tex. Cr. App. 1957) (citing *Peterson* for the proposition that "[e]vidence as to such tests would have been inadmissible upon the trial on behalf of either the State or the appellant.")

[21] 308 S.W.2d 880, 883 (Tex. Cr. App. 1957).

should be excluded from the jury."[22] In *Placker v. State*, the defendant had tried to admit evidence that he had taken and passed a polygraph examination.[23] Citing to *Peterson*, *Stockwell*, and *Davis*, we reaffirmed that "evidence of the results of a polygraph test is not admissible on behalf of either the state or the defendant."[24]

It was not until 1964, 23 years after the mention of lie detector tests began appearing in our cases and 12 years after our statement in *Peterson*, that we had occasion to rule on a case where polygraph evidence had been admitted over objection.[25] *Nichols v. State* was an appeal from a conviction for statutory rape.[26] After defense counsel "rather extensively" cross-examined the complaining witness, on redirect the prosecutor asked her, "Without telling me any results, did you take a lie detector test about this?"[27] As defense counsel objected, the witness answered in the affirmative. The trial court instructed the jury to disregard, but it did not rule on the defense motion for mistrial.

On appeal, we found "without a single exception, that every court of last resort that has

---

[22] *Id.*, at 883 (citing *Peterson*).

[23] 350 S.W.2d 546, 546-47 (Tex. Cr. App. 1961).

[24] *Id.*, at 547.

[25] There are at least two reported cases from this time period in which the results of polygraph examinations (or, at least a plain implication of the results of a polygraph examination) were admitted into evidence, but proper objections were not made. *See Gasway v. State*, 248 S.W.2d 942, 946 (Tex. Cr. App. 1952) (defense counsel introduced fact that defendant had failed polygraph examination, and did not object to later testimony regarding reliability of polygraph); *Nixon v. State*, 266 S.W.2d 150, 151 (Tex. Cr. App. 1954) (defense witness strongly implied that defendant had passed a polygraph examination; no objection is mentioned).
The dearth of cases in which polygraph results were admitted, even while numerous cases from this era mention polygraph examinations being used during police investigations, implies a general understanding that polygraph results were not admissible.

[26] 378 S.W.2d 335, 336 (Tex. Cr. App. 1964).

[27] *Ibid.*

been called upon to decide the question has ruled that results obtained from the so-called lie detector test are not admissible as evidence."[28] Even though the trial court did not deny the motion for a mistrial, we held that it was error not to have granted it because the prejudicial effect of admitting the results of a polygraph examination[29] was such that "no amount of instructions on the part of the trial court could remove from the jury the harmful effect created in their minds."[30]

Nine years after *Nichols*, we issued our most important and thorough opinion on polygraph evidence. The defendant in *Romero v. State* had entered into a signed agreement with the State that he would take a polygraph examination and the results, whatever they showed, would be admitted at trial.[31] After he failed the examination, the defendant objected to the admission of the results, claiming that the State had violated the terms of the agreement by giving him methadone shortly before the examination and by using an unqualified polygraph examiner.

---

[28] *Ibid*.

[29] "An impression must have been implanted in the minds of the jurors that the result of the lie detector test had been unfavorable to appellant or else appellant's counsel would not have objected to the question propounded by the state." *Id.*, at 337.

Our conclusion in *Nichols* that the jury inferred the results of a polygraph examination from the context in which it was mentioned is at odds with several contemporary cases in which we held that the mention of a polygraph examination, when the results were not explicitly mentioned, was insufficient to require a reversal or mistrial so long as the reference was not to the defendant taking or not taking a polygraph examination. *See Renesto v. State*, 452 S.W.2d 498, 500 (Tex. Cr. App. 1970) (so holding, and citing several other cases where it was so held). In *Roper v. State*, 375 S.W.2d 454 (Tex. Cr. App. 1964), a witness gave an unresponsive statement that the defendant took a polygraph examination during the police investigation, which, combined with his being on trial, would seem to imply the results. We held that because the question was unresponsive and we detected no bad faith on the part of the prosecutor, the trial court's instruction to the jury to disregard was sufficient. *Id.*, at 456-57.

Perhaps the holding in *Nichols* can be explained by our note that "the state's whole case depended entirely upon the testimony of this one 14 year old witness," and the result of mentioning the polygraph examination was to bolster her credibility. *Nichols*, 378 S.W.2d, at 338.

[30] *Id.*, at 338.

[31] 493 S.W.2d 206, 207 (Tex. Cr. App. 1973).

The trial court admitted the polygraph results over this objection. Aside from the polygraph examiner's testimony that the defendant "gave deceptive answers" regarding his role in the offense, the only evidence against the defendant came from accomplice testimony.[32]

We began our discussion of polygraphs by noting, "No machine or device has perhaps caused greater controversy among 'experts,' judges, lawyers, physicians, psychologists, government officials, and the public in general than the polygraph or lie-detector machine."[33] In comparing our cases barring the admission of polygraph results to those of other jurisdictions, we noted our rule "followed the almost unanimous view of American courts."[34]

We then listed several potential problems with polygraph examinations that might distort the results, such as the test subject's emotional tension, physiological abnormalities, mental abnormalities, unresponsiveness, and unobserved muscular movements that produce ambiguities or misleading indications in the blood-pressure tracing.[35] Additionally, we noted several potential problems that were unrelated to the test subject, such as potential errors by the examiner, the lack of standardization in procedures, the difficulty in jury evaluation of examiners' opinions, and the tendency of the trier of facts to treat polygraph evidence as conclusive.[36]

Although we noted that our bar on polygraph evidence had received some criticism and

---

[32] *Id*., at 209.

[33] *Ibid*.

[34] *Id*., at 210.

[35] *Id*., at 210 (citing *Henderson v. State*, 230 P.2d 495, 501-2 (Okla. Cr. App. 1951); *Commonwealth v. Fatalo*, 191 N.E.2d 479 (Mass. 1963)

[36] *Id*., at 210-11 (citing *State v. Valdez*, 371 P.2d 894, 895 (Ariz. 1962); Samuel L. Highleyman, *The Deceptive Certainty of the "Lie Detector,"* 10 HASTINGS L.J. 47, 51-61 (1958); Richard A. Sternbach, Lawrence A. Gustafson, and Ronald L. Collier, *Don't Trust the Lie Detector,* 40 HARVARD BUS. REV. 127 (1962)).

that at least two federal district courts (one of which was later overruled) had admitted polygraph evidence,[37] we concluded that these authorities were insufficient to overcome the unreliability of polygraphs: "While we are aware of efforts to promote the reliability of polygraph tests and of the claims that they are now more reliable than before, we are convinced at this time that we should adhere to the general rule of exclusion."[38]

But would a stipulation between the parties be sufficient to allow the admission of otherwise unreliable evidence? After citing to opinions from other jurisdictions, we agreed with an opinion of the Alaska Supreme Court that regardless of what the parties agreed to, it was our duty to keep unreliable evidence out of trials: "A stipulation for admission does not increase the reliability of polygraph results and therefore should not lead to any deviation from the exclusionary policy."[39] On that basis, we reversed the judgment of the trial court.

*Romero* was the last time we examined in detail the science and jurisprudence surrounding polygraph examinations, and, in the 39 years since, we have never departed from its holding.[40]

---

[37] *Id.*, at 211 (citing Ferguson, *Polygraph v. Outdated Precedent*, 35 TEXAS B.J. 531 (1972); *United States v. Ridling*, 350 F.Supp. 90 (E.D. Mich. 1972); *United States v. Zeiger*, 350 F.Supp. 685 (D.D.C. 1972) (*rev'd without op.*, 472 F.2d 1280 (D.C. Cir. 1972)).

[38] *Ibid.*

[39] *Id.*, at 213 (quoting *Pulakis v. State*, 476 P.2d 474, 479 (Alaska 1970).

[40] *See, e.g., Robinson v. State*, 550 S.W.2d 54, 60-61 (Tex. Cr. App. 1977) (reversing capital murder conviction because jury was told that the State's primary witness had passed a polygraph examination); *Shiflet v. State*, 732 S.W.2d 622, 630 (Tex. Cr. App. 1985) (where defendant, who was a sheriff's deputy, claimed admission to murder was coerced in part by failed polygraph examination, we held polygraph results were not coercive because "as an experienced police officer, [the defendant] either knew or should have known that the results of the tests were not admissible evidence against him in a court of law. It has long been the consistent holding of this Court, which we believe is taught to law enforcement officers throughout this state, that evidence of the results of a polygraph examination is not admissible evidence on behalf of either the State or the accused."); *Nesbit v. State*, 227 S.W.3d 64, 66 n.4 (Tex. Cr. App. 2007) (where the State filed a motion to revoke community supervision based on failing a polygraph examination, we noted in dicta that "[n]either the results of a polygraph test nor the 'fact' of failing a

## V. Rule 703 and Reliability

In its first four issues, the State argues that, while polygraph results are inadmissible on their own, an expert who testifies under Rule 702 may, according to Rule 703, base his opinion on inadmissible evidence and, under Rule 705,[41] inform the trial court of the basis for his opinion. So, in this case, it would have been permissible for Strain to (1) testify regarding his opinion of the appellant's honesty while the appellant was in treatment, (2) base that opinion entirely on polygraph results, and (3) *because* his opinion was based on the polygraph results, tell the trial court of the polygraph results. The State does not ask us to revisit our holding in *Romero* and, in its brief on rehearing, concedes that the results of polygraph examinations should continue to be inadmissible "for a number of reasons ...."[42]

Rule of Evidence 702 allows "a witness qualified as an expert by knowledge, skill, experience, training, or education" to give opinion testimony based on "scientific, technical, or other specialized knowledge."[43] Rule 703 specifies the bases on which an expert may base his testimony, and specifically allows that "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data [relied upon] need not be admissible in evidence."[44]

---

polygraph test are admissible in a Texas criminal proceeding.").

[41] Texas Rule of Evidence 705(a) allows a testifying expert to "disclose on direct examination, or be required to disclose on cross-examination, the underlying facts or data."

[42] The State specifically mentions Rule of Evidence 403, which allows a trial court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

[43] TEX. R. EVID. 702.

[44] TEX. R. EVID. 703.

We believe the State's interpretation stretches Rule 703 beyond its limits. Rule 703 allows opinions based only upon inadmissible evidence if the inadmissible evidence is of a sort "reasonably relied upon." "The use of [the word] 'reasonably' rather than 'customarily' or 'regularly' implies that judicial oversight was intended."[45] While Strain did make the conclusory statement that those in his field reasonably rely on polygraph results, the sole basis of his opinion was the results of a test that we have held inadmissible *because it is not reliable*. "Total reliance on inadmissible and untrustworthy facts cannot be reasonable. Nor would such an opinion achieve the minimum level of reliability necessary for admission under Rule 702."[46] Rule 703 is not a conduit for admitting opinions based on "scientific, technical, or other specialized knowledge" that would not meet Rule 702's reliability requirement. If the methodology or data underlying an expert's opinion would not survive the scrutiny of a Rule 702 reliability analysis,[47] Rule 703 does not render the opinion admissible. Thus Rule 703 did not provide a basis for the trial court to admit Strain's testimony, and we overrule the State's first four grounds for review.

## VI. The "Show No Deception" Provision

In its final ground for review, the State argues that the Court of Appeals erred by stating that polygraph results could not be admitted, even to litigate the provision in the appellant's probation condition requiring him to take and "show no deception" on polygraph examinations. The requirement that the appellant "show no deception" on the polygraph, however, strikes us as questionable. At the very least, we do not believe it presents a sufficient basis to compel the

---

[45] Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlott, *Guide to the Texas Rules of Evidence: Civil and Criminal,* 2 Tex. Prac. §703.3 (1993).

[46] *Ibid*.

[47] *See generally Kelly v. State*, 824 S.W.2d 568 (Tex. Cr. App. 1992); *Daubert*, 509 U.S. 579.

admission of polygraph results.

The Court of Appeals cited to a string of lower court cases where "taking a polygraph exam was a term or condition of community supervision,"[48] and the State directs us to a lower court opinion that held that a trial court was within its discretion to require polygraph examinations as a condition of community supervision.[49] However, the court in that case, after stating our rule that polygraph results were inadmissible, noted that the polygraph condition at issue "was imposed … not to gather possible evidence for use during a trial but solely to serve as a catalyst for further investigation."[50]

One of the suggested terms of community supervision contained in Article 42.12, Section 11 of the Code of Criminal Procedure also points at how testing, as a requirement of community supervision, should operate. Section 11(a)(14) would require that the defendant "[s]ubmit to testing for alcohol or controlled substances;" it would *not* require the defendant to "pass" such testing. The testing for alcohol and controlled substances would allow the trial court to monitor compliance with other conditions of community supervision, such as to not consume alcohol or controlled substances. That is, even though many tests for alcohol and controlled substances are quite accurate and their results admissible in court, the testing is a means to an end, not an end to itself.

If polygraph examinations were completely accurate, requiring that the appellant "show no deception" might make sense. As we discussed in *Romero*, though, there are several potential

---

[48] *Leonard*, 315 S.W.3d, at 580 n.1.

[49] *See Ex parte Renfro*, 999 S.W.2d 557, 560 (Tex. App.–Houston [14th Dist.] 1999, pet. ref'd).

[50] *Id.*, at 561.

sources of error in polygraph examination, few (if any) of which are within the test subject's control.[51] The "show no deception" requirement, by its terms, would cause the appellant to be in violation of his community supervision whenever the polygraph results indicated deception, whether those results were accurate or not. Moreover, it would allow the appellant to comply with the terms of his community supervision if he were to succeed in defeating the polygraph.

The trial court "may impose any reasonable condition [of community supervision] that is designed to protect or restore the community, protect or restore the victim, or punish, rehabilitate, or reform the defendant."[52] Whether requiring the appellant to submit to a polygraph examination is a reasonable condition is an issue we are not called on to decide today. What we decide is that any such requirement does not justify admitting legally unreliable evidence.[53]

## VII. Conclusion

Because the trial court adjudicated the appellant guilty based on a third party's exercise of discretion, we must look at the basis for that underlying exercise of discretion.

Here, the only basis for the third party's decision was the results of polygraph examinations.

We hold that Rule 703 does not allow an expert to present opinion testimony based on scientifically unreliable facts or data. Additionally, the "show no deception" requirement in the terms of the appellant's community supervision does not provide a basis for admitting unreliable evidence. Therefore, the only evidence supporting revocation was inadmissible. The trial court

---

[51] *See Romero*, 493 S.W.2d, at 210-11.

[52] TEX. CODE CRIM. PROC. art. 42.12 §11(a).

[53] *See Ex parte Doan*, 369 S.W.3d 205, at 210 (Tex. Cr. App. 2012) ("The Rules of Evidence … apply fully in a Texas probation revocation hearing.").

abused its discretion by adjudicating the appellant guilty.

We affirm the decision of the Court of Appeals


Delivered November 21, 2012.
Publish.