

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-17-00158-CR

NOAH FULTON JACKSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 09-0262X

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

After pleading guilty in 2009 to sexual assault of a child, Noah Fulton Jackson spent many years on deferred adjudication community supervision, under which he was required to attend an intensive out-patient sex-offender program (the SOP) under the counseling and treatment of Dr. Kimberly Modisette. In April 2017, after determining that Jackson had become unsuccessful in the SOP, Modisette discharged him from the program on the basis of that lack of success.[1] The trial court ruled that Jackson's discharge violated the terms of his community supervision, adjudicated Jackson's guilt, and sentenced him to eight years' imprisonment. Jackson argues that the trial court abused its discretion in adjudicating his guilt. Because we disagree, we affirm the trial court's judgment.

One of the conditions of his community supervision had required Jackson to "[e]nroll [in] . . . and attend psychological counseling sessions including [the SOP] at the direction of the [Community Supervision Officer (CSO)] and provide the [CSO] with proof of completion of the program." Testimony from Jackson's CSOs showed that he generally complied with the conditions of community supervision, except for failing several random drug tests, until 2017. Their testimony also showed that Jackson had been attending the SOP until he was discharged in April 2017. Daryll Bailey, Jackson's CSO at that time, testified that, when he was discharged, he

---

[1]The record in this case reflects the convenient—though, we believe, improper—expression that Jackson was "unsuccessfully discharged" or that his "unsuccessful discharge" was ordered. In this opinion, we conclude that Modisette was successful in her discharge of Jackson from the SOP—in other words, that her decision to discharge Jackson from the program was effective and within her discretion—because there is sufficient evidentiary support for her determination that he had become unsuccessful in meeting the SOP's requirements.

2

was out of compliance with the SOP condition. He also testified that Jackson did not enroll in another SOP after his discharge.

Modisette also testified. She explained that the SOP consists of an active treatment phase that lasts an average of two to three years, and a maintenance phase, in which the client is seen on a bi-annual or annual basis, that continues until he has completed his community supervision. She explained that, before a client transitions to the maintenance phase, he must meet certain therapeutic goals and be in compliance with his community supervision. Modisette testified that the three areas that she concentrated on with Jackson were his history of substance abuse, admitting and accepting responsibility for his sexual offenses, and changing his belief system that allowed sex to control his decision making process. She explained that these beliefs included a sense of entitlement and his emotional dysregulation, which she described as being really negative, hostile, and angry about everything and feeling like a victim. Jackson had to deal with these and demonstrate compliance before he went on to the maintenance phase. Modisette explained that, during the maintenance phase, she meets with the client for a bi-annual or annual psycho-sexual evaluation in which she looks for acute risk factors, for stable dynamic risk factors, and to see if there is any change that would suggest an elevation in risk to the community. She also testified that successfully completing the SOP would consist of controlling the acute risk factors or stable dynamic risk factors.

Jackson transitioned to the maintenance phase in 2014. Modisette testified that remaining in the maintenance phase was contingent on Jackson maintaining complete compliance and on his dynamic recidivism risk remaining at the same level. Factors that would mandate an immediate

return to active treatment included, *inter alia¸* the failure to make and keep scheduled individual sessions at the required frequency, supervision/treatment non-compliance, alcohol or drug use, an increase in occurrence of thinking errors, or any behavior that would suggest acute elevations in risk.

Modisette also testified about the circumstances that resulted in her discharging Jackson from the SOP. She testified that Jackson had come to an appointment and made some vague comments that let her know something had gone on in Harrison County. She then called his CSO and was informed that Jackson had failed a drug test, for which he should have been referred back to immediate active treatment. She met with Jackson again and talked with him about the failed drug test, and he became hostile towards his CSO, would not accept any responsibility, deflected responsibility for his offenses, showed no victim empathy, and had a complete regression. She explained that he had to return to active treatment, he became very angry and agitated, and he started talking about filing a complaint against her. She testified that, after he threatened to file a complaint, he was going to be discharged because her treatment contract stated that, if the client threatens her, it is grounds for immediate discharge. After Jackson left her office, Modisette discovered that he had taken trash from his vehicle and placed it in a bag under her vehicle.

In explaining why he was not a good candidate for the SOP, Modisette testified that Jackson's history and what she saw that day—emotional dysregulation, failure to comply, rejection of treatment and supervision, and failure to abstain from alcohol or drugs—were all acute risk factors that put him at an elevated risk to commit another sexual offense. Although she indicated

4

that Jackson had made some progress, she stated, "What I saw was a complete regression to base line, [and] his acute risk is very much elevated."

On cross-examination, Modisette testified that, when she discharges someone for his or her lack of success, she is saying that she is no longer willing to be on their risk containment team. She also testified that Jackson failed in five ways that resulted in his discharge. She explained that all of the reasons were related to acute risk factors. The first reason was his use of alcohol and drugs. The second was his rejection of treatment and supervision. She explained that the rejection of supervision is considered an acute, elevated risk that puts the client at an elevated risk for failure in his treatment. Based on what she saw, she opined that the same thinking errors that they had dealt with periodically throughout his treatment were the cause of Jackson's rejection of supervision. The third reason was Jackson's emotional dysregulation, which she explained was his becoming extremely reactive and failing to take responsibility for old offenses for which he had previously admitted responsibility. Fourthly, Jackson threatened her professional license. Modisette explained that she would not continue to treat a client after having him or her threaten her professional licensure. She stated that, before that threat, she had told Jackson that she was ordering his return to active treatment. The final reason was his putting trash under her vehicle, which was passive/aggressive behavior. She explained that one of the objectives of treatment is that there be no more victims. That means not just no more sexual-assault victims, but no more victims at all, including himself as a victim.

Modisette interpreted Jackson's threat to file a complaint as an attempt to bully or to intimidate her. She also testified, "I was willing to continue to work with him until he made that

5

threat. I felt like his acute risk was significantly elevated when he made that threat[.] I am not going any further." Modisette also testified that, sometime after his discharge, Jackson asked her if he could go to treatment in a group in Longview, but that she had refused him since he had already been discharged. She stated that, if he had asked beforehand, there would not have been a problem. She continued "[O]nce he makes that threat this is how I make a living, this is how I provide for my family."

Jackson claimed that he had completed all of his classes with Modisette and that she had told him she would send a statement of his completion, but never did. He also claimed that the first time he heard that he was supposed to be seeing Modisette twice a year was when his CSO told him to go see her. He testified that, at his annual meeting with Modisette in April 2017, she told him he would have to start coming to weekly meetings again. He said that Modisette then stepped out of the room and telephoned his CSO. When she came back in, she said that she had been told by the CSO that Jackson was hanging out with little girls. Jackson claimed that he became upset about that allegation, not about her requiring him to return to attending weekly meetings. He said that he was willing to go back on active status. Jackson also denied making any statement about filing a complaint against Modisette. He claimed that his reference to hiring a lawyer was to get the community supervision behind him. He did not deny that there was a bag of trash found under Modisette's vehicle; he explained that he was upset when he got into his vehicle and that the bag of trash fell out.

Rhonda Thomas, a friend of Jackson, testified that she had accompanied him to his April 2017 meeting with Modisette. She did not hear the conversation between Jackson and Modisette,

except when he came out of her office. She testified that Modisette had told Jackson he would have to go back to weekly meetings and that, when Jackson came out, he was mad. He told her that accusations were made about him hanging out with little girls. Although Thomas remembered trash being in her vehicle, she did not know how it got under Modisette's vehicle.

After arguments of counsel, the trial court found true the State's allegation that Jackson had failed to complete the SOP, adjudicated Jackson's guilt, and sentenced him to eight years' imprisonment.

In his sole issue, Jackson complains that the trial court erred in adjudicating his guilt. He argues that, since he could not complete the SOP until his community supervision was ended, the trial court abused its discretion by prematurely adjudicating his guilt. He also argues that Modisette, who was delegated responsibility for determining whether he completed the SOP, abused her discretion in declaring him unsuccessful and discharging him from the SOP. We disagree.

We review a trial court's adjudication of guilt in the same manner as a decision to revoke community supervision—for abuse of discretion. *Little v. State*, 376 S.W.3d 217, 219 (Tex. App.—Fort Worth 2012, pet. ref'd) (citing *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006)). In a revocation hearing, the State must prove by a preponderance of the evidence that the defendant violated a condition of his community supervision. *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006); *Pierce v. State*, 113 S.W.3d 431, 436 (Tex. App.—Texarkana 2003, pet. ref'd). A revocation order is "supported by a preponderance of the evidence" if the "greater weight of the credible evidence . . . would create a reasonable belief that the defendant has violated

7

a condition of his probation." *Rickels*, 202 S.W.3d at 763–64 (quoting *Scamardo v. State*, 517 S.W.2d 293, 298 (Tex. Crim. App. 1974)). Since the trial court is the trier of fact, it also determines the credibility of the witnesses and the weight to be given their testimony. *In re T.R.S.*, 115 S.W.3d 318, 321 (Tex. App.—Texarkana 2003, no pet.) (citing *Jones v. State*, 787 S.W.2d 96, 97 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd)). In our review, the evidence is viewed in the light most favorable to the trial court's ruling. *Lively v. State*, 338 S.W.3d 140, 143 (Tex. App.—Texarkana 2011, no pet.) (citing *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984)). The trial court does not abuse its discretion if at least one ground for revocation is supported by a preponderance of the evidence. *Id.* (citing *Sanchez v. State*, 603 S.W.2d 869, 871 (Tex. Crim. App. [Panel Op.] 1980)).

In this case, the trial court based its finding that Jackson failed to complete the SOP on Modisette's discharging him from the SOP for his having not succeeded. Therefore, the requirement that Jackson attend and successfully complete the SOP was subject to the discretion of a third party, Modisette. In such a case, we must also examine the third party's use of discretion to determine whether the trial court abused its discretion. *Leonard v. State*, 385 S.W.3d 570, 577 (Tex. Crim. App. 2012). In examining the third party's use of discretion, we determine whether it was both rational and connected to the purposes of community supervision. *Id.* The purposes of community supervision are to protect or restore the community; to protect or restore the victim; and to punish, rehabilitate, or reform the defendant. *Id.* at 577 n.13; *see* TEX. CODE CRIM. PROC. ANN. art. 42A.301(a) (West Supp. 2017).

In challenging the trial court's judgment, Jackson first argues that, since the SOP would

not be complete until his community supervision was complete, the trial court acted prematurely in adjudicating his guilt. He points to Modisette's testimony that, under her SOP, a client progresses from active treatment after two or three years, then to the maintenance phase of having bi-annual or annual evaluations, where he remains until he completes his community supervision. He also argues that, after he was discharged by Modisette, he could ask to enter a different SOP.

Jackson does not cite any legal authority supporting his contention that a trial court acts prematurely in adjudicating guilt or in revoking community supervision when a defendant is discharged from an SOP for lack of success. Jackson candidly states that he has, as have we, been unable to find such authority. To the contrary, the cases cited by Jackson show that appellate courts have affirmed trial courts that have revoked community supervision, or have adjudicated guilt, when the defendant has been discharged from an SOP for his or her failure. *See Donovan v. State*, No. PD-0474-14, 2015 WL 4040599, at *5 (Tex. Crim. App. July 1, 2015) (mem. op., not designated for publication);[2] *Bussell v. State*, No. 12-16-00117-CR, 2017 WL 2962834, at *3 (Tex. App.—Tyler July 12, 2017, pet. ref'd) (mem. op., not designated for publication); *Hart v. State*, 264 S.W.3d 364, 372 (Tex. App.—Eastland 2008, pet. ref'd); *Wright v. State*, 249 S.W.3d 581, 583 (Tex. App.—Fort Worth 2008, no pet.). In affirming the trial court, the courts in these cases examined the grounds for the discharge and the actions of the defendant to determine whether the trial court had abused its discretion.

In addition, Jackson does not cite to any testimony or other evidence in the record for his

---

[2]Although unpublished opinions have no precedential value, we may take guidance from them "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

contention that, after he was discharged, he could ask to be placed in another SOP. Further, although the defendants in the above cases had the opportunity to participate in multiple SOPs, none of these cases support the proposition that a defendant is entitled to attend another SOP after he has been discharged. In this case, Modisette's testimony explained how Jackson's use of drugs and alcohol, his failure to take responsibility for his past offenses, his anger at her and his CSOs, and his passive/aggressive behavior all contributed to an acute elevated risk to the community that he would commit another sexual offense. She also explained why, even though he had made some progress, his complete regression to baseline demonstrated that he was not a good candidate for SOP. Viewing this testimony in the most favorable light, the trial court could reasonably conclude that allowing Jackson to attend another SOP would not further the purposes of community supervision, i.e., that it would not alleviate the risk to the community that he would offend again, and that it would not contribute to his rehabilitation.

Jackson also argues that Modisette abused her discretion in discharging him. He points to those instances in Modisette's testimony where she discussed his threat to make a complaint against her and said that it was a threat to her livelihood, therefore, she immediately discharged him. Jackson argues that this shows that the reason for discharging him was that he made a threat to her livelihood, which has no relation to the purposes of community supervision.

This argument ignores the rest of Modisette's testimony in which she listed four other actions by him as additional bases for discharging him: his use of drugs and alcohol, his resistance to treatment and supervision, his failure to take responsibility for past offenses, and his passive/aggressive behavior. She also explained why each demonstrated an elevation in the acute

10

risk to the community. In addition, she explained how she saw the threat to file a complaint against her as an attempt to bully or intimidate her, which would be counter to her remaining on his risk management team. Further, she explained how all of those actions, including the threat, demonstrated that Jackson had made a complete regression to baseline. Finally, she testified that successfully completing the program would consist of controlling the acute risk factors. Jackson's complete regression to baseline showed that he was no longer controlling his acute risk factors.

Viewed in the light most favorable to the judgment, Modisette's testimony shows that the bases for her decision to discharge Jackson were both rational and related to the purposes of community supervision. *See Leonard*, 385 S.W.3d at 577. Therefore, we find that Modisette did not abuse her discretion in discharging Jackson from the SOP.

Because Modisette did not abuse her discretion in discharging Jackson from the SOP, the trial court did not abuse its discretion in adjudicating Jackson's guilt. We overrule Jackson's issue.

For the reasons stated, we affirm the trial court's judgment.


Josh R. Morriss III
Chief Justice


Date Submitted:     March 6, 2018
Date Decided:       March 26, 2018

Do Not Publish

11