In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-19-00048-CR
_____

**DESHON JAY FOSTER-SMITH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 253rd District Court**
**Liberty County, Texas**
**Trial Cause No. CR32229**

_____

**MEMORANDUM OPINION**

Appellant Deshon[1] Jay Foster-Smith appeals the trial court's order revoking his community supervision and adjudicating his guilt. In July 2016, Foster-Smith pleaded guilty to the offense of sexual assault of a child pursuant to a plea bargain.

---

[1] Appellant's name is spelled both "Deshon" and "Deshun" in the trial court records: the indictment uses "Deshun" while the order of deferred adjudication and judgment use "Deshon."

1

The trial court deferred adjudication of guilt and placed Foster-Smith on deferred adjudication community supervision for ten years.

In December 2018, the State filed a Motion to Revoke Unadjudicated Community Supervision, alleging that Foster-Smith had violated the terms of his community supervision. The next month, the State filed an amended motion to revoke and alleged the following violations of the terms of his community supervision:

> (1) The Defendant, Deshon Jay Foster-Smith, failed to pay fine and/or court costs and/or attorney fees for the following months of his/her community supervision: November 2018;
> (2) The Defendant, Deshon Jay Foster-Smith, failed to attend Sex Offender Counseling at the direction of the Supervision and Corrections Department:
>> a. March 2017
>> b. April 2017
>> c. June 14, 2017
>> d. October 4, 2017
>> e. October 3, 2018
> (3) The Defendant, Deshon Jay Foster-Smith, failed to [refrain from] direct/indirect contact with anyone under the age of 17 years old including his own minor children;
>> (a) Defendant, Deshon Jay Foster-Smith, has been receiving pictures of his own minor children from his wife since placed on probation.
>> (b) Defendant, Deshon Jay Foster-Smith, has been indirectly communicating with his children through his wife or mother since placed on probation.
>> (c) Defendant, Deshon Jay Foster-Smith, on or about the 11th day of May, 2017 was located at [an address in Texas] where his minor children reside.

2

(4) The Defendant, Deshon Jay Foster-Smith, failed to abstain from cable television or satellite television access unless approved in advance by the community supervision officer, to wit; On or about the 2nd day of October, 2018, defendant had more than the basic package of DirectTV without permission from his supervising officer.

Foster-Smith pleaded "not true" to all the alleged violations. At the revocation hearing, the State abandoned allegation 2d. The trial court found State's allegations 2a, 2b, 2e, 3a, 3c, and 4 true, adjudicated Foster-Smith's guilt, and imposed a sentence of twelve years.

On appeal, Foster-Smith argues that the State failed to prove that he violated one or more of the conditions of his probation "based on factors within his control[]" or the State failed to prove an actual violation occurred. Foster-Smith's brief argues that the violations alleged by the State are not specific enough to support a violation and that any violation was a result of factors outside Foster-Smith's control.

## Applicable Law

An appellate court's review of an order adjudicating guilt is generally limited to a determination of whether the trial court abused its discretion and is reviewable under an abuse of discretion standard. *See* Tex. Code Crim. Proc. art. 42A.108(b);[2] *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006) ("'Appellate review

---

[2] Formerly codified at Tex. Code Crim. Proc. art. 42.12 § 5(b).

of an order revoking probation is limited to abuse of the trial court's discretion.'") (quoting *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984)).

In a hearing to revoke deferred adjudication, the State only needs to prove the violation of a condition of probation by a preponderance of the evidence. *Hacker v. State*, 389 S.W.3d 860, 864-65 (Tex. Crim. App. 2013); *Rickels*, 202 S.W.3d at 763-64; *Cobb v. State*, 851 S.W.2d 871, 873 (Tex. Crim. App. 1993). The evidence meets this standard when the greater weight of the credible evidence creates a reasonable belief that the defendant has violated a condition of his community supervision. *Rickels*, 202 S.W.3d at 763-64 (quoting *Scamardo v. State*, 517 S.W.2d 293, 298 (Tex. Crim. App. 1974)). We must examine the evidence in the light most favorable to the trial court's order. *Garrett v. State*, 619 S.W.2d 172, 174 (Tex. Crim. App. 1981).

In determining whether the allegations in the motion to revoke are true, the trial court is the sole trier of facts, the judge of the credibility of the witnesses, and the arbiter of the weight to be given to the testimony. *Taylor v. State*, 604 S.W.2d 175, 179 (Tex. Crim. App. 1980); *Trevino v. State*, 218 S.W.3d 234, 240 (Tex. App.—Houston [14th Dist.] 2007, no pet.). It is within the province of the factfinder to reconcile conflicts and contradictions in the evidence, and such conflicts will not call for reversal if there is enough credible testimony to support the conviction. *See*

4

*Cooks v. State*, 844 S.W.2d 697, 708 (Tex. Crim. App. 1992); *Shah v. State*, 403 S.W.3d 29, 34 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). To support the trial court's order revoking community supervision, the State need only establish one sufficient ground for revocation. *See Moore v. State*, 605 S.W.2d 924, 926 (Tex. Crim. App. 1980).

When, as here, a trial court fails to make specific findings of fact and conclusions of law, it is presumed that the court made the necessary findings to support its decision. *Ice v. State*, 914 S.W.2d 694, 695 (Tex. App.—Fort Worth 1996, no pet.). The reviewing court does not engage in its own fact finding, but rather must review the entire record to determine whether there are any facts that lend support for any theory upon which the trial court's decision can be sustained. *Id.* at 695-96. If an implied or actual finding is supported by the record, the finding must be sustained. *Id.*

### Sex Offender Counseling

The terms of Foster-Smith's community supervision required him to attend "courses, classes, lectures, programs or other educational activity[]" for persons on community supervision for sexual assault. The terms further stated:

> Attendance and participation in said courses, classes, lectures, programs or other educational activity, is mandatory unless discharged, released or exempted by competent authority of the Liberty/Chambers

5

<u>County Community Supervision and Correction Department with consent and approval of the Court</u>.[3]

An order amending the terms of his community supervision required Foster-Smith "to attend weekly group counseling at Liberty CSCD office on Wednesdays at 6pm beginning on Wednesday, May 17, 2017 and continuing until successfully discharged by counselor."

Lacy Teran, who supervised Foster-Smith's probation, agreed that she had advised Foster-Smith that it was permissible for him to miss a counseling session "[a]s long as it was made up in a timely fashion . . . just as soon as possible." Teran testified that Foster-Smith missed a session in October 2018 "either because of work or he was sick[]" but that she still regarded missing that session as a violation because Foster-Smith did not make up the session. She further testified that she was not aware of Foster-Smith providing any reason for missing counseling sessions in March or April 2017. Teran denied giving Foster-Smith express written permission to miss these sessions and was not aware that anyone gave him such permission.

Ashley Wiggins, Foster-Smith's probation officer before Teran, testified that she told Foster-Smith that the term of community supervision that required attendance and participation in counseling "was [] to be strictly followed[]" even

---

[3] Emphasis in original.

though he expressed concerns that his work schedule could create difficulties with compliance. According to Wiggins, she received an email notification that Foster-Smith had missed two counseling sessions in April 2017, and she had no information that he attended any makeup sessions. She further testified that she addressed missing counseling sessions with Foster-Smith, and she recalled that he missed a session in April 2017. She denied having given Foster-Smith written permission to miss counseling sessions in March or April 2017 or in June 2017.

Dr. Kimm Perez testified that in 2017, Foster-Smith had been in the treatment group she facilitates for sex offenders on probation, parole, or deferred adjudication. Perez testified that Foster-Smith did not attend every weekly session in March 2017 and that he failed to attend two sessions that month. Perez denied that Foster-Smith obtained any written authorization to miss those sessions and that he did not obtain permission from her to attend makeup sessions, and she could not confirm whether Foster-Smith had attended makeup sessions. According to Perez, Foster-Smith also missed a session in April 2017. Perez read from an email she sent to Wiggins in which Perez had written that Foster-Smith had missed counseling sessions in March and April 2017.

Lindsey Brown testified that Foster-Smith attends her weekly sex offender counseling group. According to Brown, Foster-Smith did not attend the group on

October 3, 2018, and she had no information that he made up the session or scheduled a makeup session.

The trial court found that Foster-Smith failed to attend Sex Offender Counseling in March 2017, April 2017, and October 2018. Viewing the record in the light most favorable to the trial court's judgment, we conclude that the trial court did not abuse its discretion in concluding that the State proved by a preponderance of the evidence that Foster-Smith failed to attend required counseling in March 2017, April 2017, and October 2018 as alleged by the State in its motion to adjudicate. *See Hacker*, 389 S.W.3d at 864-69; *Garrett*, 619 S.W.2d at 174.

HBO Subscription

One of the terms of Foster-Smith's community supervision required:

The Defendant shall not utilize cable television or satellite television access unless approved in advance by the community supervision officer. If approved for access, the Defendant shall provide a written, itemized verification of these services received on a monthly basis. Approval may be rescinded or modified at any time.

At the hearing, the defense argued that Foster-Smith "automatically" got HBO as a result of his account with DirecTV and AT&T and he was not aware that he had HBO.[4] During opening argument, the following exchange occurred:

---

[4] Foster-Smith's attorney also argued that the restriction that he could have nothing beyond basic programming was "unduly burdensome" and a violation of the First Amendment, but Appellant does not raise this issue on appeal.

8

[Defense counsel]: . . . I know that the evidence will definitely show that, as soon as he was instructed by the probation department to get rid of that package, he complied immediately and so therefore --

THE COURT: So he was able to get rid of the package?

[Defense counsel]: Yes, Your Honor, he was.

THE COURT: So he could have refused it in the very beginning or gotten permission.

[Defense counsel]: But only if he was aware that he was getting it on the front end. I think that the package that they had, it was just an automatic "Here's HBO for six months," and he wasn't necessarily aware of that because -- my understanding of what --

THE COURT: Did he notify probation and say "Hey, I'm getting this package. What do you think about it?" How did they find out?

[Defense counsel]: Well, he had originally received some permission. That may have been revoked at a later date, or once it was known that he had HBO, it was revoked at that point.

He did admit to it to his probation officer, and when she told him to get rid of it, he immediately complied.

Lacy Teran testified that Foster-Smith had permission to have cable or satellite television, but he was only permitted to have basic programming and he was not permitted to have HBO. Teran testified that Foster-Smith did not live with his wife, but that his wife had provided a copy of their DirecTV bill. Teran understood that, after she discussed the problem with Foster-Smith, he and his wife cut off HBO and retained only basic programming plus perhaps a sports channel.

9

Ashley Wiggins denied giving Foster-Smith permission to access any kind of cable or satellite television. She did not recall discussing access to cable or satellite television with him and was not aware that he had permission to receive cable or satellite television.

State's Exhibit 1 was admitted into evidence, which the State explained was "Probation Chronologicals," (the "chronologicals") which Teran and Wiggins explained were the records of contacts with a defendant during community supervision. The chronologicals include a note from Teran in October 2018 that Foster-Smith was watching shows on HBO and that her supervisor instructed her to tell Foster-Smith to deactivate the account immediately and to provide documentation of the cancellation. The chronologicals also include a note that Foster-Smith informed Teran that "his package comes with HBO[]" but that his wife would send a copy of the bill that would reflect "the new package and the basic channels."

Foster-Smith's wife testified that the TV subscription is in her name, that she is in charge of the bills at Foster-Smith's house, and that Foster-Smith does not have any control over what is on the TV subscription. When asked how they came to have HBO, she explained "[i]t was a free subscription when we were with AT&T. As long as we had our telephones with AT&T, HBO was free, and so I wasn't paying for it,

10

so I never removed it." His wife further testified that she believed Foster-Smith knew he had the subscription and that he watched boxing and documentaries on HBO. His wife testified she removed HBO from the subscription the same day that Foster-Smith told her the HBO subscription was a problem.

On the record before us, the trial court could have concluded that Foster-Smith violated the condition as alleged—that he not utilize cable television or satellite television access without advance approval. The trial court also could have concluded that Foster-Smith failed to take precautionary measures to avoid utilization of unapproved cable or TV services. *Cf. Munoz v. State*, No. 05-05-00652-CR, 2006 Tex. App. LEXIS 6971, at **2-3 (Tex. App.—Dallas Aug. 8, 2006, no pet.) (mem. op., not designated for publication) (Where trial court revoked appellant's probation because he violated condition that he have no contact with children seventeen years or younger, the appellate court affirmed the trial court's revocation and concluded that the evidence showed appellant had been in contact with children without taking precautionary measures.).

Appellant argues that any violation of the terms of his community supervision was due to "factors beyond the Appellant's control[,]" including illness and his work schedule, citing to *Leonard v. State*, 385 S.W.3d 570, 577, 583 (Tex. Crim. App. 2012). We find *Leonard* factually distinguishable. In that case, Leonard's therapist

11

had discharged him from required therapy because he did not believe that Leonard was being truthful with him based on the results of polygraph testing. *Id.* at 573. The Court explained:

> What has happened here is that the trial court, through a condition of the appellant's community supervision, made the appellant's compliance with the terms of his community supervision subject to the discretion of a third party. In such a case, to determine whether the trial court abused its discretion we must also examine the third party's use of its discretion to ensure that it was used on a basis that was rational and connected to the purposes of community supervision.

*Id.* at 577. The Court concluded that the results of the polygraph testing—which were the only basis for the therapist's decision—were not admissible and therefore could not be used as a basis for adjudicating Leonard's guilt. *Id.* at 583.

In this case, the record does not show that alleged violations were based on a lie detector test or other inadmissible evidence. *See id.* at 577, 583. Rather, the trial court could have disbelieved Foster-Smith and could have concluded that Foster-Smith understood he needed to attend all counseling sessions, that he knew he must make up missed counseling sessions but failed to do so, and that he understood his access to subscription television was limited to basic programming, yet he took no steps to remove HBO from his subscription until he got in trouble for watching it, and that he also watched HBO without prior approval. *See Rickels*, 202 S.W.3d at 763-64.

Appellant's arguments on appeal generally challenge the specificity of the terms of his supervision and the *violations* that the State alleged. But to the extent Appellant now seeks to challenge the specificity of the *terms* of his community supervision, he has failed to preserve error. *See* Tex. R. App. P. 33.1(a)(1) (to preserve error, an objection must be timely lodged with the trial court); *Armstrong v. State*, 340 S.W.3d 759, 764 (Tex. Crim. App. 2011) ("[B]ecause Appellant affirmatively accepted and waived any objections to the conditions [of community supervision], he cannot complain about them for the first time on appeal.").

The State only needed to establish one of the alleged violations to support revocation of Foster-Smith's community supervision. *See Moore*, 605 S.W.2d at 926. As discussed herein, we have determined that the evidence supports at least two grounds of the trial court's findings—that Foster-Smith failed to attend required counseling and that he accessed HBO television without prior approval. We need not address the trial court's other findings. *See* Tex. R. App. P. 47.1. We overrule Appellant's issues and affirm the judgment of the trial court.[5]

---

[5] The State's brief argues that the judgment should be reformed; however, the clerk's record includes a Nunc Pro Tunc Judgment Adjudicating Guilt that corrected the errors the State addresses, therefore we need not reform the judgment.

13

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on October 23, 2019
Opinion Delivered October 30, 2019
Do Not Publish

Before Kreger, Horton and Johnson, JJ.