

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-22-00139-CR

---

CHRISTOPHER LEE VAIL, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 8th District Court
Hopkins County, Texas
Trial Court No. 2028169

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

MEMORANDUM OPINION

Pursuant to a plea agreement with the State, Christopher Lee Vail pled guilty to one count of indecency with a child by contact and one count of indecency with a child by exposure.[1] The trial court deferred a finding of guilt on both counts and placed Vail on deferred adjudication community supervision for ten years on each count. On July 20, 2021, the State moved to adjudicate Vail guilty of both offenses. After a hearing on the matter, the trial court granted the State's motion, adjudicated Vail guilty of both counts, and sentenced him to twenty years' and ten years' imprisonment, respectively.[2] Vail appeals, arguing (1) that there was insufficient evidence to support the trial court's finding that Vail violated the terms and conditions of his community supervision and (2) that the evidence was insufficient to support the trial court's assessment of court-appointed attorney fees. For the reasons below, we affirm the trial court's judgment of conviction and modify the assessed attorney fees in this case.

## I. Background

On April 29, 2022, the State filed its second amended motion to proceed with an adjudication of guilt, alleging that Vail violated the terms and conditions of his community supervision in the following ways:[3]

---

[1] Vail appeals his conviction of indecency with a child by exposure in our cause number 06-22-00138-CR. Vail has filed a single brief raising an issue common to both appeals, that is, that the evidence was insufficient to support the trial court's finding that he violated the terms and conditions of his community supervision. This opinion addresses that point of error as it relates to both convictions.

[2] The trial court ordered Vail's sentences to run consecutively.

[3] While contending that he had complied with the terms of deferred adjudication community supervision, Vail agreed that the alleged violations were applicable to both offenses.

1.     that he failed to report in person not less than once per month as directed by his community supervision officer (CSO) for the months of June, August, October, November, and December 2021 and February and March 2022;

2.     that he failed to obtain approval from his CSO before changing his residence or leaving the county;

3.     that he failed to pay a sex-offender fee of $5.00 for the months of June, July, August, September, October, and December 2021 and January, February, March, and April 2022;

4.     that he failed to register as a sex offender with local law enforcement in the county in which he resided. The relevant community supervision condition stated, "If [Vail] spends 48 consecutive hours or more on three (3) occasions during any given month [he] shall provide local law enforcement information required under Article 62.02[](b) of the [Texas Code of Criminal Procedure] the address of residence and statement of intent to stay";

5.     that he failed to comply with all updated procedures, including giving law enforcement seven days' notice that he would be leaving the county in which he resided;

6.     that he failed to participate and complete sex-offender counseling and pay associated costs; and

7.     that he failed to participate and comply with all rules and requirements of intensive supervision.

The trial court held a hearing on the State's motion. Vail entered pleas of "not true" to the State's allegations against him.

In support of its motions, the State called Vail's CSO, Kris Crews, who supervised sex offenders and individuals who had been placed on intensive supervision. Crews testified that Vail's first meeting with him occurred on or around May 14, 2021.[4] During their initial meeting, Crews went over the terms and conditions of Vail's community supervision. He also explained

---

[4]There is some confusion in the record as to whether the first meeting occurred on May 13 or May 14. It appears that Crews met with Vail on May 13, at which time he was in county jail. Vail was released from jail the following day and met with Crews in Vail's office. This minor discrepancy does not alter the outcome here.

3

that, within seven days from the date of their meeting, Vail was required to register as a sex offender with the local sex-offender-registry agency. According to Crews, Vail failed to register within the required time.

Initially, Vail told Crews that he intended to live with his father in Allen, Texas, which is in Collin County. Vail's father, though, would not agree to that arrangement. Instead, Vail's father provided him with a motel for two nights, and then Vail "w[ould] be on his own after that." When Vail made an unsuccessful attempt to register with the Allen Police Department, "he was informed that that was within a child safety zone." Around June 10, Vail contacted Crews via telephone,[5] informing him that he was living in a parking lot of the Collin Creek Mall in Plano, Collin County, Texas. That same day, Crews informed Vail "that he had until 5:00 on June 14 to find a place to register and live." On June 14, Vail reported to Crews, telling him that he was still living in the parking lot at Collin Creek Mall. However, on June 15, Vail contacted Crews, informing him that he was at the Hopkins County AAA Storage and that the sheriff's department refused to "pick him up because they had no room."

On June 23, Crews received information that Vail was in an assisted-living facility in Wylie, Texas, but Crews was unable to confirm that information. Wylie is predominately in Collin County, but parts are in Dallas County and Rockwall County. That same day, Vail told Crews that "he was currently in the hospital at Trinity Mother Frances in Sulphur Springs [Hopkins County] and . . . they were maybe keeping him for a while due to a pending bone scan and . . . they moved him to a facility in Winnsboro to rehab." During that telephone call, Crews

---

[5]Unless otherwise stated, Vail's contact with Crews was via telephone.

4

reminded Vail to report to the local police department to let them know that he was in the area. Vail told Crews that he did not have his own phone and that his car was impounded. As far as Crews knew, Vail never informed the local police department that he was in Winnsboro.

Two days later, Crews spoke with Vail, who told him that he was going to be transferred to the Winnsboro Hospital on June 27 or 28 to receive intravenous antibiotics for an infection in his leg. Winnsboro is partially in Wood County and Franklin County and is very near to Hopkins County. Vail said he would be in the hospital for about six weeks. Crews alerted the Winnsboro Police Department that Vail was in town. Crews also reminded Vail that he was required to contact the local police department to let them know that he was in their community. On July 6, Vail informed Crews that he would stop by the community supervision office the next day. But Vail also told Crews that he did not have a vehicle because he needed $500.00 to get his car out of the impound. According to Vail, he was planning on traveling to Frisco the next day for a meeting at the social security office. He also planned to live in the Winnsboro area once he began receiving social security benefits. Again, Crews reminded Vail that he was required to register with local law enforcement seven days in advance of moving to Winnsboro.

On July 7, Vail met with Crews at his office in Sulphur Springs. Crews reported that he was still homeless, that he was supposed to be admitted to the Winnsboro Hospital, and that he would be in the hospital until July 28. During their meeting, Crews referred Vail to Lisa Phillips, a licensed sex-offender-treatment provider, so that he could begin counseling. Vail informed

5

Crews that he was not guilty of the charged offenses and that he "just said that he pled guilty so he could be with his ill father."

On July 15, Vail phoned Crews to report that he recently had been released from the hospital. At that time, Vail intended to stay in his sister's driveway until he could find a permanent place to live. The record does not establish the location of his sister's residence. On July 19, Vail reported that he was currently in the Parkland Hospital in Dallas where he was being treated for a foot infection. On July 26, Vail told Crews that he would be staying at the Parkland Hospital for an extended period of time. An officer with the Dallas Police Department (DPD) contacted Crews to inform him that Vail had attempted to register with him, but that he told Vail that they did not make hospital visits. On July 30, Vail informed Crews that he was still in Parkland Hospital but that, once he was released from the hospital, he intended to live in Garland. On August 19, Vail reported to Crews that he would be returning to Parkland Hospital the next day to receive wound care. Crews testified, "He said in the meantime he'll be staying at a bus station."

On August 30, Vail began receiving monthly social security benefits of around $2,500.00 per month. As a condition of his community supervision, Vail was required to pay a sex offender supervisory fee of $5.00 per month, but from June 2021 to April 2022, he did not make a payment. However, after receiving his social security benefits, Vail made a lump sum payment that brought him current on his sex-offender supervisory fees.

On September 1, Vail left Crews a message telling him that he was still in Parkland Hospital. A couple of days later, Crews sent Vail a text message, again giving Vail the contact information for Phillips so that he could set up counseling services with her. On September 28, Vail contacted Crews to tell him that "he was [still] having difficulty with the infection on his left foot." He also told Crews "that he and his girlfriend [were] looking for a place to live in Garland."

On September 24, Vail contacted Crews to inform him that he was out of the hospital and staying at the InTown Suites. Vail told Crews that he planned on registering as a sex offender with the DPD. Crews said, "With the pending motion to proceed [to adjudication of guilt], I wouldn't accept a transfer [for probation purposes] to Dallas County." Regardless, Vail never registered or attempted to register with the DPD. In short, between September 24 and 28, Vail stayed in the parking lot of the Sulphur Springs Walmart, the Motel 6 in Greenville (Hunt County), the Wingate by Wyndham in Richardson, the InTown Suites, and the Plano Inn & Suites. In total, Vail stayed in at least four different counties over a five-day period.

Vail had an appointment for an office visit with Crews on September 30, but he did not attend the appointment because "he overslept and he was feeling sick." Vail was also scheduled to meet with a counselor for a "preinterview," but he called Crews on October 1 and asked if he could cancel it because, according to Vail, he was on his way to the emergency room because he had a fever. On October 6, Vail telephoned Crews, informing him that he was in Baylor Hospital and that he had registered as a sex offender in Plano. On October 25, Vail called Crews to tell

7

him "that he was living out of his vehicle [in the] Walmart parking lot [in] Collin County." Later, Vail called Crews from the Richardson Police Department, telling Crews that he had checked into a long-term stay hotel in Richardson but that he did not know the name of the hotel. Later, Vail decided that the Richardson hotel was too expensive and that he was going to have to find another place to live.

On October 26, Crews received a telephone call from either the Collin County Police Department or the Plano Police Department, informing him that the department "was filing a failure to comply charge on [Vail] for not informing them of his release from the hospital and where he had been staying upon his release." On December 13, Vail was again in Parkland Hospital, "[h]oping to get out on December 17." Vail told Crews that he intended to live in Mesquite, Texas, when he was discharged. On December 17, Crews sent another text message to Vail, reminding him that he was supposed to meet with Phillips and that he needed to contact her to make an appointment.

On January 3, 2022, Vail called Crews and told him that he was living in Dallas. Crews asked Vail if he had registered as a sex offender with the DPD, and Vail stated that he had not. On January 3, Vail contacted Crews to tell him that he was moving to a different address in Dallas. Crews informed Vail that he could not live at the new address because it was too close in proximity to a children's daycare. When Crews was asked whether Vail was registered as a sex offender at the time of the adjudication hearing, Crews stated, "No. He's listed on the [Texas Department of Public Safety] register as an absconder."

8

Vail continued to move from place to place. On April 19, Crews contacted Vail to remind him that he was ordered by the trial court to appear in court on April 20 at 1:30. Crews asked Vail if he would be in court the next day, to which Vail responded that he would make an appearance "if he ha[d] enough gas." Vail did not make an appearance in court. The next day, Vail contacted Crews to tell him that he had not been discharged from the hospital but that he would be discharged that day. On April 25, Vail called Crews to ask him for the name of the licensed sex-offender-treatment provider. Once again, Crews told Vail, by phone and email, that her name was Phillips. That same day, Phillips reported to Crews that Vail did, in fact, call her but that "[Vail] said he couldn't hear her." Phillips placed a subsequent phone call to Vail and left a message for him. Vail did not return Phillips's call.

According to Vail, during June and July, he was in a variety of hospitals and rehabilitation centers in different cities. During that time, Vail missed a June court date due to illness, so it was rescheduled to July 26. Vail did not appear for the July 26 court date. On August 12, Vail informed Crews via telephone that he was supposed to be released from Parkland Hospital in Dallas. Upon his release, Vail intended to move into an apartment in Dallas. On August 19, however, Vail informed Crews that he was, in fact, out of the hospital, but that he was homeless and living in a train station in Richardson. Vail also told Crews that he would be checking back into Parkland Hospital the following day. On September 13, Vail told Crews that he was planning on living in the InTown Suites in Dallas and that he would be registering with the DPD. To Crews's knowledge, that never happened. On September 23, Vail

9

reported that he was going to have to leave Dallas because, "due to his charge[,] . . . he would not be welcome to stay there any longer, and he reported that he would possibly be moving to Tyler, Smith County."

In addition, Crews summarized that Vail failed to report once a month in person for the months of June, August, October, November, and December 2021, as well as February and March 2022. According to Crews, the great majority of the time, Vail would tell him where he was located after he was already there.[6]

After hearing testimony, the trial court found that Vail had violated the terms and conditions of his community supervision, granted the State's motion, adjudicated Vail guilty of both counts, and sentenced him to twenty years' imprisonment for his conviction of indecency with a child by contact and ten years' imprisonment for his conviction of indecency with a child by exposure. This appeal followed.

## II.    Sufficient Evidence Supported the Trial Court's Adjudication of Vail's Guilt

In his first point of error, Vail contends that "the State failed to present sufficient evidence that Vail violated the terms and conditions of his community supervision where the record shows that Vail was prevented from complying due to circumstances beyond his control." We disagree.

The determination to proceed with an adjudication of guilt after a defendant is placed on deferred adjudication community supervision "is reviewable in the same manner as a revocation

---

[6]In addition to Crews's testimony, the victim's mother testified that her daughter had suffered trauma as a result of Vail's actions, including, emotional problems, harming herself, suicide attempts, and panic attacks. As a result, she was required to seek in-patient psychological treatment.

hearing." TEX. CODE CRIM. PROC. ANN. art. 42A.108(b). "At a revocation hearing, the State must prove by a preponderance of the evidence that a condition of community supervision has been violated."[7] *Perry v. State*, 367 S.W.3d 690, 693 (Tex. App.—Texarkana 2012, no pet.); *see Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984).

In a hearing on a motion to revoke community supervision, "the trial court is the sole trier of facts" and the judge of the "credibility of witnesses and weight to be given [their] testimony." *Taylor v. State*, 604 S.W.2d 175, 179 (Tex. Crim. App. [Panel Op.] 1980). When the State meets its burden of proof and no procedural obstacle is raised, the decision whether to revoke community supervision is within the discretion of the trial court. *Flournoy v. State*, 589 S.W.2d 705, 708 (Tex. Crim. App. [Panel Op.] 1979). As a result, our review of the trial court's order revoking community supervision is limited to determining whether the trial court abused its discretion. *Clerkley v. State*, 515 S.W.3d 331, 332 (Tex. App.—Tyler 2015, no pet.) (citing *Cardona*, 665 S.W.2d at 493). If there is some evidence to support the finding of even a single violation, the revocation order must be upheld. *See Cochran v. State*, 78 S.W.3d 20, 28 (Tex. App.—Tyler 2002, no pet.) (citing *Moore v. State*, 605 S.W.2d 924, 926 (Tex. Crim. App. [Panel Op.] 1980)).

In support of his position that the trial court improperly revoked his community supervision because the alleged violations were beyond his control, Vail directs us to *Leonard v. State*, 385 S.W.3d 570 (Tex. Crim. App. 2012). In that case, one of the conditions of Leonard's

---

[7]The preponderance-of-the-evidence standard is met when the greater weight of the credible evidence before the trial court supports a reasonable belief that a condition of community supervision has been violated. *Rickels v. State*, 202 S.W.3d 759, 764 (Tex. Crim. App. 2006).

11

community supervision was that he submit to a polygraph examination and show no deception during the examination. *Id.* at 572. The State moved to adjudicate Leonard's guilt, alleging that he violated the conditions of his community supervision by showing "significant criteria indicative of deception" during a polygraph examination and by failing to successfully complete sex-offender treatment. *Id.* at 572–73. During the hearing on the State's motion to adjudicate, the trial court overruled Leonard's objection that the results of the polygraph examination were unreliable and, therefore, inadmissible. *Id.* at 573. A psychotherapist then testified that Leonard had been discharged from a program for sex offenders because he failed multiple polygraph examinations, which indicated that he was engaged in "secret keeping." *Id.* On that basis, the trial court revoked Leonard's community supervision and adjudicated him guilty. *Id.* at 572. Finding no abuse of discretion, the appellate court affirmed the trial court's ruling. *Id.*

However, the Texas Court of Criminal Appeals reversed the appellate court's decision. In doing so, the court reiterated that the results of a polygraph examination were "inadmissible over proper objection because the tests are unreliable." *Id.* at 577. "If the polygraph results were inadmissible, then the record would not contain a basis for [the treatment provider's] decision to discharge [Leonard], and the trial court abused its discretion by adjudicating [Leonard]'s guilt." *Id.* To the extent *Leonard* stands for the proposition that a defendant's community supervision cannot be revoked based on circumstances beyond his control, for the reasons below, we do not find Vail's reliance on *Leonard* to be compelling.

12

Here, the evidence shows that Vail failed to report to Crews in person over a period of several months, which included June, August, October, November, and December 2021 and February and March 2022. Although Vail would notify Crews as to where he was living after he moved from one county to another—which he did on at least four different occasions—he did so without first getting permission from Crews. Further, even though Crews informed Vail that he was required to inform local law enforcement when he was in the area, Vail failed to comply with those instructions most of the time. In addition, Crews informed Vail on multiple occasions that he was required to meet with Phillips, but he failed to do so, even once. As a result, he failed to participate in sex-offender counseling.

Vail blames his poor physical condition and his lack of transportation for his failures to comply with the terms of his community supervision. Clearly, Vail experienced many physical difficulties during his term of community supervision, but contrary to Vail's assertion, many of his failures were not solely beyond his control. For instance, Vail failed to obtain Crews's permission before moving from one county to another. He claims that his poor health prevented him from doing so. Yet, as he was apparently capable of making telephone calls *after* he moved, Vail could have just as easily telephoned Crews to seek his permission *before* he moved. Moreover, the evidence showed that Vail was moving from city to city on almost a weekly basis. Consequently, Vail had the ability to procure some type of transportation to get from place to place. Had he wanted to meet with Crews in person, as he was required to do, Vail was capable

of doing so. The same reasoning applies to Vail's failure to meet with Phillips and to participate in counseling.

We, therefore, find that there was sufficient evidence to support the trial court's determination that Vail violated the terms and conditions of his community supervision. Accordingly, we must uphold its revocation orders and its resulting judgment adjudicating guilt. *See Cochran*, 78 S.W.3d at 28 (citing *Moore*, 605 S.W.2d at 926).

We overrule Vail's point of error.

## III. The Trial Court's Assessment of Attorney Fees Must be Modified

The record shows that, on February 3, 2021, the trial court appointed an attorney to represent Vail and that the attorney represented Vail up to and during the deferred adjudication community supervision proceeding. On May 13, 2021, Vail's appointed counsel filed a claim for legal services in the amount of $400.00. The trial court subsequently assessed $400.00 in attorney fees against Vail in its order of deferred adjudication. We cannot find, and Vail does not claim, that he objected to the trial court's assessment of those fees.

On August 18, 2021, the trial court appointed a different attorney to represent Vail. That particular attorney represented Vail up to and during the revocation and adjudication hearing. On September 29, 2022, that attorney filed a claim for legal services in the amount of $500.00. Pursuant to his request, the trial court approved payment of $500.00 in attorney fees in its order for attorney's claim for services. The clerk's bill of costs shows that Vail was responsible for

14

$900.00 ($400.00 plus $500) in attorney fees. The judgment adjudicating guilt shows that the trial court assessed $918.97 for "[r]eimbursement [f]ees."[8]

Under Article 26.05(g) of the Texas Code of Criminal Procedure, a trial court has the authority to order the reimbursement of a court-appointed attorney's fees only if "the judge determines that a defendant has financial resources that enable the defendant to offset in part or in whole the costs of the legal services provided . . . including any expenses and costs." TEX. CODE CRIM. PROC. ANN. art. 26.05(g) (Supp.). "[T]he defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees" of legal services provided. *Armstrong v. State*, 340 S.W.3d 759, 765–66 (Tex. Crim. App. 2011) (alteration in original) (quoting *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010)). If the record lacks any indication that the defendant's financial status or ability to pay changed at any point in the case or that the trial court made a subsequent finding that he was no longer indigent, he is considered indigent throughout the proceedings. *See Cates*, 402 S.W.3d at 251–52; *see also Mayer v. State*, 309 S.W.3d 552 (Tex. Crim. App. 2010); *Martin v. State*, 405 S.W.3d 944, 946–47 (Tex. App.—Texarkana 2013, no pet.).

---

[8]Because the clerk's bill of costs assessed only $900.00 in attorney fees, we will presume that the remaining $18.97 in the judgment adjudicating guilt was due to some other type of reimbursement fee. Moreover, the attorneys' claims for legal services amounted in total to $900.00, not $918.97. In addition, the trial court issued orders confirming $400.00 and $500.00 in attorney fees. At any rate, it is irrelevant whether attorney fees were assessed at $900.00 or $918.97. As we discuss below, this is so because the trial court determined at the beginning of the case that Vail was indigent and, without a determination to the contrary, he is presumed to have remained indigent throughout the entire proceeding. Consequently, the trial court erred when it assessed attorney fees against Vail. *See Cates v. State*, 402 S.W.3d 250, 252 (Tex. Crim. App. 2013).

15

Vail points out that he remained indigent throughout the case and that there was no evidence that the trial court ever determined otherwise. According to Vail, the trial court's $900.00 assessment of attorney fees must be deleted from the judgment adjudicating guilt.

In *Riles v. State*, 452 S.W.3d 333 (Tex. Crim. App. 2015), the Texas Court of Criminal Appeals made clear that (1) procedural default applies to issues regarding attorney fees assessed against an indigent defendant receiving community supervision in an order of deferred adjudication, and (2) procedural default is premised on the defendant's "knowledge of, and failure to challenge, an issue." *Id.* at 337. Riles pled guilty to possession of a controlled substance with intent to deliver, adjudication was deferred, and she received community supervision. *Id.* at 334. Riles signed plea papers containing an admonishment that part of her mandatory supervision costs included a court-appointed attorney fee. Finally, the order of deferred adjudication, which she also signed, provided that she was ordered to pay "all court costs including Court Appointed Attorney Fee." *Id.* The next day, her trial counsel submitted his attorney fee voucher for $1,000.00, and it was listed in the district clerk's bill of costs. *Id.* at 334–35. A year and a half later, her community supervision was revoked, she was sentenced to seven years in prison, and she was ordered to pay all court costs, including the fees of her court-appointed attorney. *Id.* She appealed the judgment of adjudication arguing that there was no evidence that she had the ability to pay the attorney fees. *Id.* at 335.

The Texas Court of Criminal Appeals held that, since Riles had knowledge of the attorney fees, she was required to challenge the sufficiency of evidence supporting the payment

16

of them in a direct appeal from the original order of deferred adjudication. *Id.* at 337. Since she failed to appeal the original order of deferred adjudication, she had procedurally defaulted her complaint. *Id.* (citing *Manuel*, 994 S.W.2d at 661–62). The court then clarified that procedural default is premised on "an appellant's knowledge of, and failure to challenge, an issue." *Id.* Riles's several acknowledgments that she would be required to pay attorney fees showed that she had the requisite knowledge to challenge the fee award on direct appeal, even if she did not immediately know the exact amount of the fees. *Id.*

The record in this case shows that the trial court entered its order of deferred adjudication community supervision on May 13, 2021. The order indicated that Vail was assessed $400.00 in court-appointed attorney fees. Attached to the trial court's order was a document containing a list of conditions, one of which required Vail to pay $400.00 in attorney fees. Vail signed that document acknowledging that he was aware of the attorney fee assessment, and he "ACKNOWLEDGE[D] THE RECEIPT OF A COPY OF TH[O]SE CONDITIONS OF COMMUNITY SUPERVISION." Vail has not challenged the veracity of that document. Therefore, there is evidence that Vail had the requisite knowledge to challenge, on direct appeal, the attorney fees assessment against him in the deferred adjudication order. Since he failed to appeal that order, he procedurally defaulted his complaint related to the $400.00 attorney fee assessment.

That said, the record shows that Vail was indigent at the time of the adjudication hearing and that there was no determination by the trial court that he was able to pay court-appointed

17

attorney fees at that time. Accordingly, we find that the trial court erred when it assessed $500.00 in attorney fees incurred during the adjudication proceeding. Consequently, we must modify the trial court's judgment adjudicating guilt and the clerk's certified bill of costs (1) by changing the assessment under the heading "Reimbursement Fees" to $418.97, and (2) we must modify the certified bill of costs by changing the line item for "(RF) ATTORNEY CLAIMS" from $900.00 to $400.00.

## IV.    Conclusion

We modify the trial court's judgment adjudicating guilt by changing the assessment under the heading "Reimbursement Fees" to $418.97, and we modify the clerk's certified bill of costs by changing the line item for "(RF) ATTORNEY CLAIMS" from $900.00 to $400.00. We affirm the trial court's judgment, as modified.


Jeff Rambin
Justice


Date Submitted:    April 25, 2023
Date Decided:      June 1, 2023

Do Not Publish

18